COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Petty and Alston
Argued at Salem, Virginia


MARCIOUS ANTOINE COUSINS

                                                          OPINION BY
v.       Record No. 1318-09-3                    JUDGE LARRY G. ELDER
                                                           MAY 25, 2010

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Mosby G. Perrow, III, Judge

Keith Orgera, Assistant Public Defender (Office of the Public
Defender, on briefs), for appellant.

Erin M. Kulpa, Assistant Attorney General (Kenneth T. Cuccinelli,
II, Attorney General; Jennifer C. Williamson, Assistant Attorney
General, on brief), for appellee.


Marcious Antoine Cousins (appellant) appeals from his jury trial convictions for

second-degree murder and use of a firearm during the commission of a felony, and his bench

trial conviction for possession of a firearm by a convicted felon.  On appeal, he contends the trial

court improperly prohibited him from using evidence that the decedent belonged to a particular

gang, erroneously preventing him (1) from questioning the jury pool about possible gang

affiliations to assess bias, (2) from cross-examining one of the Commonwealth's witnesses about

his affiliation with the decedent's gang, also as relevant to show bias, and (3) from introducing

evidence about the decedent's gang affiliation to show the decedent's propensity for violence as

related to appellant's claim of self-defense.  We hold the proffered evidence was relevant,

material, and more probative than prejudicial and that the trial court's refusal to allow appellant

to use the evidence during trial in an attempt to show the witness' bias was not harmless error.

Thus, we reverse and remand for retrial.  Because gang affiliation evidence will be admitted on

remand, we hold appellant will be entitled, within limits to be determined by the trial court in its discretion, to have the jury questioned regarding possible bias resulting from gang membership.[1]

## I.

## BACKGROUND[2]

Because the admissibility of evidence depends on whether its proponent has laid a proper foundation from which the jury might conclude it is relevant to the proponent's theory of the case, we recite the evidence in a manner that reflects appellant's theory of the case. See, e.g., Charles E. Friend, The Law of Evidence in Virginia § 1-5, at 30 (6th ed. 2003) (noting that "[w]here *relevance*, as distinguished from competence, [of proffered evidence] is involved," and "the relevance . . . depend[s] upon the existence of a fact, . . . the judge may be obligated to admit the evidence and allow the jury to make the 'preliminary' determination of fact" as long as "there is some evidence from which the jury might reasonably find the fact upon which relevancy depends" (citing McMurray v. Commonwealth, 143 Va. 489, 129 S.E. 252 (1925))).

At about 3:30 a.m. on April 20, 2008, Officer T.B. Bouyea responded to a report of a shooting at a particular motel. Officer Bouyea, who was nearby when he received the call, arrived very quickly and found Michael Blanchard lying on the ground in the parking lot, bleeding and unresponsive. No weapon was found on Blanchard or anywhere in the vicinity.

It was undisputed that Blanchard had been shot by appellant, who claimed he fired in self-defense. It was also undisputed that, at the time of the shooting, Blanchard and his friend, Charlie Scott, were standing in the motel parking lot. Appellant, accompanied by passengers

---

[1] Because we reverse and remand based on the trial court's improper exclusion of evidence of gang affiliation to show bias, we need not specifically address the question of whether evidence of gang affiliation might be relevant and admissible at trial for other purposes, as well.

[2] The parties agree that the evidence introduced at appellant's subsequent bench trial, although admitted through fewer witnesses, was substantially the same as at his jury trial.

Calvin Hunter and Marcus Elliot, had driven Hunter's car into the parking lot a short time earlier to pick up Ciara Gillespie. No evidence indicated any of the occupants of the car knew Blanchard or Scott. The dispute existed over who started the altercation and upon what provocation. Appellant claimed Scott and the decedent attacked him without provocation.

Prior to trial, appellant moved the court to allow expert testimony and other evidence concerning Blanchard's and Scott's gang affiliation, admitted by the Commonwealth in discovery, to show Scott's bias; to show motive for Scott and Blanchard for the otherwise unexplained attack on appellant; and to show Blanchard's reputation in the community for violence as relevant to appellant's self-defense claim. Appellant also sought a ruling permitting the admission of the testimony of Suntrees Wheeler, who had previously "[taken] out a charge" against Blanchard for rape but later dropped it, saying she lived in Blanchard's gang territory and had been threatened by Blanchard and the gang not to "[go] forward with the charge." Finally, appellant asked to *voir dire* the jury panel regarding any connections to Blanchard's alleged gang, the White Rock Crew, in order to assess possible bias.

The Commonwealth filed a competing motion seeking to exclude evidence of the decedent's alleged gang membership based on a lack of evidence to suggest gang rivalry or activity of any sort. The Commonwealth conceded "they may be able to question Mr. Scott about bias if they can establish some kind of gang connection and some kind of gang connection between Mr. Scott and the victim." The Commonwealth also opposed the admission of the testimony of Suntrees Wheeler concerning the allegation of rape from 2004.

The court ruled appellant could ask the venire "whether any of them have any knowledge of these . . . offenses," but that he could not inquire about gang membership in *voir dire* or mention it in his opening statement. It later excluded all evidence relating to gang membership because appellant did not claim to be in a gang and failed to proffer any reason for why a

- 3 -

gang-related attack would have occurred. The trial court noted appellant might be able to use the gang affiliation evidence on cross-examination of Scott, saying that if Scott denied being a friend of the decedent's, appellant could impeach him with evidence they were in the same gang. The court ruled that the testimony of Suntrees Wheeler would be admitted as relevant to self-defense.

At trial, the Commonwealth called three eyewitnesses. Ciara Gillespie testified that as she climbed into the right rear passenger seat of the car appellant was driving, passenger Calvin Hunter told appellant someone had said something to them. Appellant backed the car up to that person as he stood outside the motel and asked what he had said. The man, Scott, said "he didn't say anything," and at that moment "this random person," Blanchard, "r[a]n from behind out of nowhere" and hit appellant twice in the face. Appellant said to Hunter, "hand me that, Op or Ock or whatever," and Hunter retrieved a gun from the passenger's door and handed it to appellant. Blanchard backed up with his hands up. Appellant "pointed the gun out the window and said, do you see this?" Blanchard responded, "I'm not scared of no mother fuckin' gun," and appellant shot Blanchard. Gillespie said she could see both of Blanchard's hands when appellant fired and that she never heard Blanchard or Scott say he had a gun or any other type of weapon. She also never saw Blanchard reach for anything. However, Gillespie got out of the car when she saw Hunter pass the gun to appellant, and she conceded on cross-examination that her view of Blanchard could have been obstructed during that time.

Marcus Elliot, appellant's cousin, who was sitting in the rear seat of the car on the driver's side, also testified for the Commonwealth. Elliot said that after Gillespie got into the car, a man walked up to the car and argued with appellant. The man, Scott, opened appellant's car door, and appellant shut the door while they continued to argue. Scott "swung inside the car," but Elliot did not know whether Scott hit appellant. A few minutes later, "another guy[, Blanchard, came] running up to the car," and "[t]hen all three of them [were] arguing," and "they

[were] swinging up inside the car" and trying to open the car door. Blanchard "was reaching for something" "in the front of his pants," and he stepped away from the car and "twisted and went inside his pants." Elliot, fearing Blanchard was reaching for a gun, ducked, and he heard a gunshot about the same time Gillespie jumped out of the car. Immediately afterward, appellant drove away.

Charlie Scott testified for the Commonwealth, admitting he and Blanchard were good friends and had known each other for 12 years. Scott said they were at the motel for Blanchard's younger sister's after-prom party when Scott saw the car appellant was driving, which resembled one a friend of his owned. He mistakenly thought his friend was driving it and said, "Yo." When the car backed up, Scott realized his mistake. He claimed appellant "just started trouble" and that they exchanged words for two or three minutes. Scott then saw the passenger retrieve a chrome object, which he "knew . . . was a [hand]gun," from the right door panel and set it in his lap. Just then, Blanchard came outside and asked Scott if he was all right. Scott said, "[Y]eah, they trying to start a little bit of trouble," and he warned Blanchard not to get too close to the car "because the passenger got a gun on his lap." Scott moved backward, but Blanchard moved closer to the car, to a point six or seven feet away from it, and Scott saw the gun in appellant's hand. Scott said Blanchard and appellant "were having a little conflict" at that time, "they was just going back and forth," but Scott claimed he could not hear what was being said, and he "just [saw] [appellant] fire the gun." As soon as the shot was fired, the car "just peeled off," and Scott realized Blanchard had been shot. Scott denied seeing Blanchard with a gun or taking a weapon from Blanchard's waistband. Scott denied seeing a girl exit the motel and get into the car, and he also denied that either he or Blanchard had been "swing[ing] [at] . . . [appellant]."

Appellant renewed his motion to question Scott about whether he and Blanchard belonged to a gang. Outside the presence of the jury, Scott denied he was a member of a gang, and the trial court ruled that testimony was not relevant and could not be presented to the jury.

Appellant called his uncle, front-seat passenger Calvin Hunter, to testify. Hunter said that while they were in the parking lot in Hunter's mother's car, which Hunter routinely drove, Scott walked "right" up to the driver's window and "started running off at his mouth" in an "angry" fashion. Hunter did not know Scott and said no one in the car said anything rude to Scott before he approached the car. When Scott walked up to the car, appellant told Scott "he ain't have . . . nothing to do with why we was there." Hunter, who admitted he had been quite drunk that evening, said he did not think there was any physical contact between appellant and "the first guy," Scott. Hunter said that when the second person, Blanchard, came up to the car, Blanchard had his hands in his pants, up under his shirt, in a manner Hunter demonstrated for the jury, and that Blanchard started swinging his closed fist inside the driver's window. Blanchard succeeded in opening the car door, but Hunter was paying more attention to the first person, Scott, "and making sure that he didn't try to get in [the car] or do anything." Hunter claimed not to know anything about the gun appellant used and said he could not see Blanchard's hands immediately before appellant fired because the driver's door was obstructing his view.

Appellant testified in his own behalf, saying that while he was circling the motel looking for Gillespie, he drove past a person who said something, so appellant said, "What's up?" The person, Scott, whom appellant did not know, said, "Where are ya'll going?" Appellant responded, "[N]ah, dog, you don't know us." The man "kind of seemed frustrated," but appellant "kept on going," "pull[ing] up a little bit to wait for [Gillespie] to come out."

Scott then "came directly to [appellant's] door," "started saying some aggressive things," and opened appellant's car door, but appellant "pulled it back shut." Scott "kept on saying

- 6 -

things," including "White Rock, . . . White Rock, and pointing at . . . his forearms." Scott then "started swinging at [appellant] through the window." Appellant said he had no idea why Scott was mad, that he did not insult Scott, and that he was, in fact, "trying to brush it off," "try[ing] to avoid it." Appellant also tried to avoid Scott's swings, but Scott struck him once in the face.

While Scott was still at the window, another person appellant did not know, Blanchard, came up to appellant's window, and Scott moved toward the back door of the car. Blanchard, too, tried to open appellant's door, but without success. Blanchard then "swung and hit [appellant] through the window twice" while "saying some aggressive things." While Blanchard was at the window, Scott remained at the side and "was still making comments[,] as well." Blanchard and Scott stopped trying to hit appellant, and Blanchard backed up and reached beneath his shirt. Appellant testified that, as this happened, a "gun was produced" from the passenger side of the car, and he grabbed it from the seat. Appellant testified the gun was not his and that he did not know, before it appeared on the seat, that a gun was in the car. When appellant saw Blanchard back away from the car and move his hand under his shirt, in a manner appellant demonstrated for the jury, appellant "thought [Blanchard] was reaching for a gun," and he used the gun from the car seat to fire a single shot "to defend [his] life." Appellant said that, because he did not see Scott reach for anything, appellant did not fire at Scott.

Appellant testified he did not try to drive away before he fired because he thought the only way to protect himself and his passengers was to shoot. Immediately after he fired, he drove off, and he turned himself in to police six days later. He testified he was scared and that before he turned himself in, he "heard about the possibility of some of his people trying to" do something, but appellant was unable to elaborate due to an objection. Appellant then testified he "heard some" "specific" "things" indicating he "[might] be injured." Appellant initially denied

knowing where the gun came from, but he then testified that, after the shooting, he "gave it back to Mr. Hunter.  Well, I gave it to Mr. Hunter."[3]  Appellant admitted he was "a convicted felon."

The court allowed appellant to call Suntrees Wheeler, who testified Blanchard raped her six or seven years prior to trial but that he was not tried or prosecuted and that she had not had any problems or even any contact with him since that time.

Appellant then questioned two police officers regarding Blanchard's and Scott's gang involvement outside the presence of the jury in order to proffer their testimony for the record. Officer C.A. Dowdy, a member of the Lynchburg Police Department's street crimes unit, which was responsible for "gang intelligence coordination," testified he was also certified as a gang specialist by the Virginia Gang Investigators Association.  Early in the morning on April 20, about half an hour before appellant shot Blanchard, Dowdy encountered Blanchard and Scott at a local restaurant and identified them both as members of the White Rock Crew gang "[j]ust by speaking to them about it."  Dowdy testified he had never heard appellant's name in connection with any gang membership or activity.

Officer Kevin Poindexter was also questioned outside the presence of the jury about his gang expertise, which included his involvement as regional director of the Virginia Gang Investigators Association, his maintenance of files on active gang membership for the Lynchburg Police Department, and his prior qualification as a gang expert in "all three state courts" in Lynchburg.  Poindexter testified that Blanchard and Scott were both members of Lynchburg's White Rock Crew gang at the time of Blanchard's death.  Poindexter examined an autopsy photo of the decedent and identified a tattoo on his upper arm that said "WRC 4 life."  Poindexter indicated the tattoo signified that Blanchard claimed to be a member of the White Rock Crew gang for life and that if he had such a tattoo without being a member of the gang, "[i]t would

---

[3] At appellant's subsequent bench trial, he testified the gun "was [Hunter's] weapon."

- 8 -

probably upset" people who were in the gang. Poindexter testified the police department had no intelligence indicating appellant was a member of any gang.

Poindexter testified that "in gangs in general," it is important to have the respect of fellow members. He said members of the same gang will "work to protect each other" and "lie to police everyday about everything." He explained that whether members of the same gang would lie "to get one of the other out of trouble" "[d]epends on the individual."

Without hearing any gang-related evidence, the jury found appellant guilty of second-degree murder rather than first-degree as charged, and it also found him guilty of the related use-of-a-firearm offense. The jury recommended the minimum sentence of five years for the second-degree murder conviction and three years for the related firearm offense. In a subsequent bench trial, the trial court found appellant guilty of possessing a firearm after having been convicted of a felony. Following both trials, the trial court imposed the sentences recommended by the jury and also imposed a sentence of five years for the felon-in-possession conviction, all sentences to run consecutively with no time suspended.

Appellant then noted the instant appeal.

II.

ANALYSIS[4]

A.

USE OF EVIDENCE OF GANG MEMBERSHIP DURING TRIAL

"Evidence is admissible if it is both relevant and material." Evans-Smith v. Commonwealth, 5 Va. App. 188, 196, 361 S.E.2d 436, 441 (1987). "Evidence is relevant if it

---

[4] Because appellant's first listed assignment of error (whether the court erred in preventing him from questioning the jury about gang membership) is somewhat dependent upon his other assignments of error (whether evidence concerning the decedent's and witness Scott's alleged gang membership was admissible at trial), we consider the admissibility of this evidence first and evaluate the *voir dire* issue last.

has any logical tendency, however slight, to establish a fact at issue in the case." Ragland v. Commonwealth, 16 Va. App. 913, 918, 434 S.E.2d 675, 678 (1993). "Evidence is material if it relates to a matter properly at issue" in the case. Evans-Smith, 5 Va. App. at 196, 361 S.E.2d at 441. "[W]hen relevant evidence is offered which may be inflammatory . . . , its relevancy 'must be weighed against the tendency of the offered evidence to produce passion and prejudice out of proportion to its probative value.'" Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986) (quoting State v. Flett, 380 P.2d 634, 636 (Or. 1963)). Ultimately, "[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988). See generally Payne v. Commonwealth, 233 Va. 460, 357 S.E.2d 500 (1987) (upholding admission of evidence that the inmate defendant's stated motive in killing the inmate victim was to "prove himself" in order to be admitted into a prison gang); Utz v. Commonwealth, 28 Va. App. 411, 505 S.E.2d 380 (1998) (in a case in which the defendant asserted he acted in self-defense, upholding the admission of the Commonwealth's evidence that the defendant and the victim were in rival gangs to establish the possibility of a motive for the killing other than self-defense); People v. Knox, 608 N.E.2d 659, 663 (Ill. App. Ct. 1993) (holding that "where there is sufficient proof that gang membership or activity is related to the crime charged," even where "the prosecutor [has] acknowledged that the shootings were not the result of a dispute between rival gangs," "[e]vidence relating to the defendant's gang membership or gang-related activities is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act"), cited with approval in Utz, 28 Va. App. at 422 n.2, 505 S.E.2d at 385 n.2.

## 1. Cross-Examining Scott to Show Bias Based on Gang Membership

"An accused has a right to cross-examine prosecution witnesses to show bias or motivation[,] and that right, when not abused, is absolute.  The right emanates from the constitutional right to confront one's accusers."  Brown v. Commonwealth, 246 Va. 460, 463-64, 437 S.E.2d 563, 564-65 (1993); see Davis v. Alaska, 415 U.S. 308, 315-18, 94 S. Ct. 1105, 1110-11, 39 L. Ed. 2d 347, 353-55 (1974) (holding the Sixth Amendment's Confrontation Clause required a defendant to have some opportunity to show bias on the part of a prosecution witness).  "Such an inquiry is always relevant, and the jury should consider the evidence of bias in deciding what weight to give to the testimony of the witness."  Friend, supra, § 4-6(a), at 157 (footnote omitted).  "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony."  United States v. Abel, 469 U.S. 45, 51, 105 S. Ct. 465, 468, 83 L. Ed. 2d 450, 457 (1984).  "[Although] [e]vidence of specific acts of misconduct is generally not admissible in Virginia to impeach a witness' credibility[,] . . . where the evidence . . . is relevant to show that a witness is biased or has a motive to fabricate, it is not collateral and should be admitted."  Banks v. Commonwealth, 16 Va. App. 959, 962, 434 S.E.2d 681, 683 (1993).  "[C]ross-examining counsel is . . . never precluded from producing extrinsic evidence if the bias is denied."  Friend, supra, § 4-6(a), at 157.

The United States Supreme Court has held that "[a] witness' and a party's common membership in [a prison gang], even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias."  Abel, 469 U.S. at 52, 105 S. Ct. at 469, 83 L. Ed. 2d at 457.[5]  Over the defendant's assertion that the court should have acted to limit the

---

[5] Although Abel was decided under the Federal Rules of Evidence, the federal evidentiary rules the Court considered all have similar counterparts in Virginia law.  See Fed. R. Evid. 401 (defining relevant evidence); Fed. R. Evid. 402 (providing that all relevant evidence is

prejudice resulting from such cross-examination by "cut[ting] off the testimony after the prosecutor had elicited that [the witness] knew [the defendant] and both may have belonged to an organization together," the Court held that "the *type* of organization in which a witness and a party share membership may be relevant to show bias." Id. at 54, 105 S. Ct. at 470, 83 L. Ed. 2d at 458. The Court explained that

> [i]f the organization is a loosely knit group having nothing to do with the subject matter of the litigation, the inference of bias arising from common membership may be small or nonexistent[,] . . . [whereas] [t]he attributes of the . . . secret prison sect sworn to perjury and self-protection . . . bore directly not only on the *fact* of bias but also on the *source* and *strength* of [the witness'] bias[,] . . . show[ing] that [the witness] had a powerful motive to slant his testimony toward [the defendant], or even commit perjury outright.

Id. at 54, 105 S. Ct. at 470, 83 L. Ed. 2d at 458-59. The Supreme Court noted the trial court took steps to "avoid *undue* prejudice to [the defendant]" by "order[ing] that the [gang] name 'Aryan Brotherhood' not be used," by "offer[ing] to give a limiting instruction concerning the testimony," and by "sustain[ing] defense objections to the prosecutor's questions concerning the punishment meted out to unfaithful members." Id. at 54, 105 S. Ct. at 470, 83 L. Ed. 2d at 459 (emphasis added).

Similarly, here, appellant's Sixth Amendment right of confrontation entitled him to cross-examine the Commonwealth's witness, Charlie Scott, about whether he and the decedent were members of the same gang, the White Rock Crew. Scott denied such membership when examined outside the presence of the jury, and the trial court ruled that Scott's response was not relevant. We conclude appellant's proffered evidence that Scott and the decedent were members of the same street gang was relevant to the issue of Scott's bias and that whether Scott was

---

admissible, except as otherwise provided by the Constitution, applicable statute or rule); Fed. R. Evid. 403 (providing that evidence should not be admitted if its prejudicial effect outweighs its probative value).

biased was material to appellant's theory of the case. We also conclude as a matter of law that appellant's proffered evidence concerning *the fact* of their membership in the same gang was not more prejudicial than probative. Here, appellant was entitled to explore witness Scott's possible bias in favor of the decedent based on appellant's proffered evidence of their common gang membership. Although the Commonwealth acknowledged prior to trial "that they may be able to question Mr. Scott about bias if they can establish . . . some kind of gang connection between Mr. Scott and [the decedent]," the trial court erred in refusing to allow appellant to cross-examine Scott about this source of potential bias and to impeach him with extrinsic evidence.

Appellant himself testified that Scott chanted "White Rock" and pointed to his forearms immediately before he began what appellant contended was the unprovoked attack, in which Scott tried unsuccessfully to open appellant's car door and then punched appellant through the window. Appellant proffered the detailed testimony of two police officers, who were certified gang specialists and knowledgeable in gang matters in the city, that Scott and the decedent were both known members of the White Rock Crew gang. One of those officers testified he had spoken to Scott and the decedent only half an hour before the shooting and that both men had identified themselves to him at that time as members of the White Rock Crew gang. Finally, the autopsy photo introduced by the Commonwealth and identified by Officer Poindexter in his proffered testimony showed that the decedent had "WRC 4 ever" tattooed on his upper arm, and Officer Poindexter identified this tattoo as meaning "White Rock Crew [Gang] [for]ever." This evidence, if credited by the jury, was sufficient to establish that Scott's membership in the same gang as the decedent might cause him, "unconsciously or otherwise," to "slant . . . his testimony . . . against [appellant]." Id. at 52, 105 S. Ct. at 469, 83 L. Ed. 2d at 457.

- 13 -

Further, as the Supreme Court noted in Abel, certain attributes of that gang membership may "[bear] directly not only on the *fact* of bias but also on the *source* and *strength* of [Scott's possible] bias." Id. at 54, 105 S. Ct. at 470, 83 L. Ed. 2d at 458-59. Thus, we conclude appellant was also entitled to present expert testimony concerning general traits of gangs in the city and the traits of the White Rock Crew gang in particular as those traits bore further on the strength of Scott's possible bias, subject to reasonable limitations, as in Abel, to prevent prejudice from outweighing probative value.

## 2. Harmless Error Analysis

The existence of error does not automatically compel a reversal of appellant's convictions. In all cases in which we determine error has occurred, "harmless-error review [is] required." Ferguson v. Commonwealth, 240 Va. ix, ix, 396 S.E.2d 675, 675 (1990). Appellant avers the errors were not harmless, and we agree.

The improper restriction of cross-examination is an error of constitutional magnitude. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674, 686 (1986). "'[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt;' otherwise the conviction under review must be set aside." Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967)).

"[O]ur analysis turns not on the evidence excluded . . . but on the evidence in the record, viz., [the witness'] testimony, which was not fully subject to cross-examination." Scott v. Commonwealth, 25 Va. App. 36, 42, 486 S.E.2d 120, 123 (1997). "'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt.'" Maynard v.

Commonwealth, 11 Va. App. 437, 448, 399 S.E.2d 635, 641 (1990) (en banc) (quoting Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438, 89 L. Ed. 2d at 686). Important factors in this analysis are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438, 89 L. Ed. 2d at 686-87. "'[H]armless error analysis . . . [is not] simply a sufficiency of the evidence analysis.'" Williams v. Commonwealth, 32 Va. App. 395, 400, 528 S.E.2d 166, 169 (2000) (en banc) (quoting Hooker v. Commonwealth, 14 Va. App. 454, 457-58, 418 S.E.2d 343, 345 (1992)). "An error does not affect the verdict if we can determine, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." Cairns v. Commonwealth, 40 Va. App. 271, 286, 579 S.E.2d 340, 347 (2003); see Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc).

Here, we cannot conclude, without usurping the jury's fact finding function, that the trial court's refusal to admit evidence of Scott's and the decedent's gang membership, as relevant to show bias, was harmless error as to his jury trial convictions for second-degree murder and use of a firearm in the commission of murder. Appellant's theory of the case was that the altercation either began as a gang-related attack or quickly evolved into one. Appellant averred that he acted merely to defend himself when first Scott, and then Blanchard, punched him through his open car window and when Blanchard backed away from the car and reached beneath his shirt toward his waistband, in a movement that appellant thought indicated he was about to retrieve a firearm. The fact that Scott and the decedent were members of the same gang was probative of whether Scott's testimony about the incident was either knowingly or unknowingly slanted against appellant.

Appellant's ability to challenge Scott's testimony based on bias arising from his membership in the same gang with the decedent was particularly important in light of Scott's testimony that he and Blanchard did not attack appellant and that he found no gun on or around Blanchard after the shooting. Although appellant was free to cross-examine Scott for bias based on his twelve-year friendship with Blanchard, the fact of their membership in the same gang, as well as proffered evidence concerning the willingness of some gang members to "cover" for one another, would have provided additional evidence from which the jury could have concluded Scott had an incentive to slant his testimony about the altercation or to lie about it.

Thus, as to the murder and related use-of-a-firearm convictions, this is not a case in which the other evidence of guilt was so overwhelming and the error so insignificant by comparison that we can conclude the error was harmless. This is also not a case in which the point the erroneously excluded evidence was offered to prove was established by other undisputed evidence in the record. As appellant points out, even without the excluded evidence, the jury failed to convict him on "the top count" of the indictment, first-degree murder, and it recommended the lowest available sentence within the range for second-degree murder.

On these facts, we cannot conclude "'that the error[s] did not influence the [fact finder], or had but slight effect.'" Clay, 262 Va. at 260, 546 S.E.2d at 731 (quoting Kotteakos v. United States, 328 U.S. 750, 764, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557, 1566 (1946)). Thus, we reverse appellant's convictions for second-degree murder and use of a firearm in the commission of that offense and remand for retrial.

For similar reasons, we hold the errors also were not harmless as to appellant's conviction for possessing a firearm after having been convicted of a felony. Appellant conceded he possessed the firearm long enough to shoot the decedent but claimed he was entitled to invoke the common law defense of necessity as recognized in Humphrey v. Commonwealth, 37

Va. App. 36, 553 S.E.2d 546 (2001). The "essential elements" of this defense "include '(1) a reasonable belief that the action was necessary to avoid an imminent threatened harm; (2) a lack of other adequate means to avoid the threatened harm; and (3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm.'" Id. at 49, 553 S.E.2d at 552 (quoting Buckley v. City of Falls Church, 7 Va. App. 32, 33, 371 S.E.2d 827, 827-28 (1988)).

In rejecting appellant's claim of necessity, the trial court made several explicit findings of fact. It accepted Scott's testimony that the encounter began when Scott "hailed the vehicle that [appellant] was driving because he thought somebody was in there that he knew" but that "it turned out it wasn't." It also found that Blanchard "showed up on the scene[,] . . . jumped into it, . . . probably had no business [getting involved,] and didn't know what was going on." It found credible Scott's testimony that he saw appellant grab a gun from the passenger's lap and warned Blanchard about it as Scott was backing away from the car but that "Blanchard's a big shot" and "goes in and says . . . he's not afraid of [appellant] even when he produces a gun." The trial court also expressly rejected as not credible the testimony of appellant and Elliot that Blanchard "was reaching" under his shirt toward his waistband when appellant fired.

If the trial court had ruled properly that appellant's evidence of Scott's and the decedent's gang membership was admissible as probative of Scott's bias, the court might instead have credited appellant's theory of the case. Appellant's theory of the case included the following: (1) that he armed himself in the reasonable belief that he was in danger of imminent harm based on Scott's and the decedent's exhortations to him to "get out of the car" so they could "fuck [him] up," followed by their efforts to remove him from the car and punch him through the open window; (2) that, at the instant appellant armed himself, driving away was an inadequate means of avoiding the threatened harm because Scott and the decedent were actively engaged in trying

to remove him from the car; and (3) that a direct causal relationship existed between appellant's act of arming himself and avoiding the threat of harm presented by Scott and the decedent at that time based on their physical attack on him with their fists.

Thus, we cannot conclude the error was harmless beyond a reasonable doubt as to appellant's bench trial conviction for possessing a firearm after having been convicted of a felony.  Accordingly, we also reverse appellant's conviction for this offense and remand for retrial.[6]

B.

LIMITATIONS ON <em>VOIR DIRE</em> TO PREVENT<br>QUESTIONING ABOUT GANG MEMBERSHIP

We now consider the trial court's ruling preventing *voir dire* of the venire panel regarding whether they or any of their family members or friends were members of the same gang as the victim, the White Rock Crew, in order to assess possible bias.

"[A]n accused is entitled to an impartial jury as a matter of constitutional guarantee, reinforced by legislative mandate and by the Rules of . . . court."  Martin v. Commonwealth, 221 Va. 436, 444, 271 S.E.2d 123, 128 (1980) (footnotes omitted).  Code § 8.01-358, made applicable to criminal proceedings by Code § 19.2-260, provides for *voir dire* of a prospective juror "to ascertain whether he is related to either party, or has any interest in the cause, . . . or is sensible of any bias or prejudice therein."  Rule 3A:14 similarly requires *voir dire* "to determine whether anyone . . . [h]as any interest in the trial or the outcome of the case . . . [or] [h]as a bias or prejudice against the Commonwealth or the accused."  In keeping with these principles, the court must exercise its discretion "to empanel jurors who are free from bias or prejudice against

---

[6] As stated <u>supra</u> in footnote 1, because we reverse and remand based on the trial court's improper exclusion of evidence of gang affiliation to show bias, we need not specifically address appellant's third assignment of error, whether evidence of gang affiliation might be relevant and admissible at trial for other purposes, as well.

the parties and who 'stand indifferent to the cause.'" Scott v. Commonwealth, 1 Va. App. 447, 451, 339 S.E.2d 899, 901 (1986) (quoting Breeden v. Commonwealth, 217 Va. 297, 298, 227 S.E.2d 734, 735 (1976)), aff'd, 233 Va. 5, 353 S.E.2d 460 (1987).

Given our ruling that the trial court erroneously excluded at least some of appellant's proffered gang evidence and that this evidence will be admissible on retrial, the evidence of Scott's and the decedent's gang membership will be squarely before the jury.[7] Thus, we hold that, on remand, appellant is entitled to *voir dire* the venire panel regarding this issue. See, e.g., People v. Strain, 742 N.E.2d 315, 321 (Ill. 2000) (in a case in which the defendant belonged to a gang and the motive for the crime stemmed from a gang rivalry, holding that "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias"); see also State v. Lugo, 835 A.2d 451, 461 (Conn. 2003) (suggesting that *voir dire* questions about gang membership should inquire about gangs in general and not be overly factually specific so that they do not "improperly . . . afford[] defense counsel an opportunity to gauge how each prospective juror would view his defense"). We need not decide the precise parameters or scope of such questioning. We also need not decide under what circumstances appellant might be entitled to have a juror struck for cause due to an admission of having some relationship to a gang member. We decide only that—on the facts of this case, in which we have ruled that evidence of the decedent's and a witness' gang membership is admissible—appellant was

---

[7] As appellant avers on brief, the decedent's autopsy photo was admitted into evidence at trial. Appellant's proffered testimony from Officer Poindexter indicates that the design and lettering "WRC 4 ever" tattooed on the decedent's arm, clearly visible in the autopsy photo, indicate the decedent was a member of the White Rock Crew gang. To the extent any member of the jury was a member or close associate of a member of the White Rock Crew gang, that jury member would have known of the decedent's gang affiliation, based on the tattoo, despite the trial court's refusal to admit evidence regarding that affiliation at trial.

entitled to make inquiry for the purpose of uncovering possible bias against him, subject to reasonable limitations to be imposed by the trial court in its broad discretion over *voir dire*.

III.

For these reasons, we hold that the proffered evidence was relevant, material, and more probative than prejudicial and that the trial court's refusal to allow appellant to use it during trial in an attempt to show bias was reversible error. Thus, we reverse and remand for retrial. Because gang affiliation evidence will be admitted on remand, we hold appellant will be entitled, within limits to be determined by the trial court in its discretion, to have the jury questioned regarding possible bias resulting from gang membership.

<u>Reversed and remanded.</u>