UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Huff, Judges Alston and Russell
Argued at Alexandria, Virginia

CHRISTINE McKINNEY

v.      Record No. 0897-17-4

FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES

MEMORANDUM OPINION* BY
CHIEF JUDGE GLEN A. HUFF
JANUARY 30, 2018

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

Mark H. Bodner for appellant.

Deborah C. Laird, Assistant County Attorney; Sameena Sabir,
Guardian *ad litem* for the minor child (Elizabeth D. Teare, County
Attorney; Karen Gibbons, Deputy County Attorney, on brief), for
appellee.

Christine McKinney ("mother") appeals the decision of the Circuit Court of Fairfax

County ("trial court") terminating her residual parental rights to her minor daughter ("T.C.")

pursuant to Code § 16.1-283(C)(2).  On appeal, mother contends that the evidence was

insufficient to justify termination under the statute and that the trial court erred by admitting

hearsay evidence.  For the following reasons, this Court affirms the trial court's ruling.

I.  BACKGROUND

When reviewing a trial court's decision to terminate parental rights, this Court views the

evidence "in the light most favorable to the prevailing party below."  Ferguson v. Stafford

County Dep't of Soc. Servs., 14 Va. App. 333, 336, 417 S.E.2d 1, 8 (1992).  The Fairfax County

Department of Family Services ("DFS") prevailed at trial and is thus entitled to "the benefit of

_____
* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

any reasonable inferences" drawn from the evidence. Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003) (citing Wright v. Wright, 38 Va. App. 394, 398, 564 S.E.2d 702, 704 (2002)). "Where the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." Ferguson, 14 Va. App. at 336, 417 S.E.2d at 8. So viewed, the evidence is as follows.

In May 2015, DFS obtained an emergency removal order for T.C. and her sister, who were living with their mother at the Patrick Henry Shelter. The removal order cited concerns about mother's capacity and ability to parent as well as her failures to seek mental health treatment for her paranoia and delusions, address the medical and mental health needs of her children, and take steps necessary to secure permanent housing.[1]

The juvenile and domestic relations district ("JDR") court issued a preliminary order placing the children in foster care. The order directed mother to participate in psychological and psychiatric evaluations and a parent-child evaluation, to follow all treatment recommendations from those evaluations, to participate in visits with T.C., and to sign all releases necessary for DFS to provide services. In July 2015, the JDR court approved a foster care plan with the goal of returning T.C. to mother's custody and ordered mother to participate in additional services, including a parenting class. The JDR court held a series of review hearings through 2015, each time maintaining the foster care goal of returning T.C. to mother. During 2015 and early 2016, however, mother was uncooperative with multiple DFS caseworkers and did not comply with court-ordered mental health evaluations, treatment, or other services.

One of the major points of conflict between mother and DFS involved scheduling visitation with T.C. Mother had only four visits with T.C. from May to August 2015. She

---

[1] Mother has two other children, both of whom have reached the age of majority and are not part of this appeal.

frequently demanded that visits be rescheduled, and she failed to show up for them even when transportation was provided by DFS in an effort to meet her needs. In September 2015, DFS suspended visits when T.C. informed her foster mother that someone had touched her inappropriately. She also engaged in highly sexualized behavior as observed by her foster mother. Child Protective Services (CPS) initiated an investigation into potential sexual abuse by either T.C.'s sister's male companion or by mother. Mother did not respond to requests for meetings to discuss the situation. The CPS investigation was ultimately inconclusive, and DFS initiated the process to resume supervised visits with some restrictions on mother's contact during the visits. When presented with these conditions, mother became hostile and combative. DFS eventually altered the conditions, making them vague and generic, but mother remained defiant and accused DFS of placing unreasonable limits on her visitation based on false accusations.

In addition to the conflict over visitation, mother failed to complete the court-ordered parenting class and her own psychological evaluations. She began the age-specific parenting class with T.C., but did not complete it because she had already completed one with her older daughter and she believed that she did not need to complete the second class. In an effort to help mother comply with the court's orders, DFS scheduled both the parent-child evaluation and mother's psychological evaluation on the same day. After completing the parent-child evaluation, the psychologist attempted mother's individual evaluation. When mother was told that she would not be given a copy of the evaluation report, she became uncooperative and belligerent. She left the evaluation and never completed it.

While in foster care, T.C. exhibited profound behavioral challenges which eventually led to her placement in the home of Jackie Phan ("Phan"), a licensed therapeutic foster parent. Phan observed T.C. acting out sexually, suffering from hallucinations, wetting the bed, and engaging

in other behaviors symptomatic of psychological trauma. T.C. was unable to care for her own hygiene needs or perform daily self-care. Phan instituted detailed behavioral plans to help T.C. learn to control her inappropriate sexual behavior and to perform hygiene and self-care tasks. Through Phan's ongoing, highly structured behavioral program, T.C. was able to make significant progress in correcting her behavioral issues.

At the time of the parent-child evaluation mentioned above, T.C. had not seen mother for several months and had made great strides in her behavior. The psychologist testified that T.C.'s interaction with mother at the evaluation was not grossly out of the ordinary, but she diagnosed T.C. with post-traumatic stress disorder. She also noted that T.C.'s records showed a previous diagnosis of dissociative identity disorder. Following the parent-child evaluation, T.C. was returned to Phan's custody and Phan drove her home.

Phan later testified that T.C. had a major behavioral incident in the car on the way home, which included extremely inappropriate sexual behavior, speaking in multiple voices, and hysterical crying. At home over the next few days, her behavior regressed significantly. Based in part on Phan's reports of this incident, the psychologist recommended no contact between T.C. and mother. DFS suspended visitation entirely based on this recommendation, and it never resumed visits because mother failed to complete her own psychological evaluation. DFS could not establish a workable treatment plan for T.C. and mother without input from a professional clinician regarding mother's mental health.

Mother's communication with DFS from late 2015 through 2016 was nearly nonexistent. She only provided DFS with an email address in someone else's name. She was unresponsive to email contact, or responded only with demands, and she ignored most requests for face-to-face meetings. When she did meet with caseworkers, she was frequently defensive and uncooperative. In late 2015, DFS workers attempted to meet with mother to discuss future

visitation with T.C., employment, housing, and other services.  Mother missed the first meeting, and at the second provided little helpful information before becoming belligerent over issues related to visitation.  DFS also held three family partnership meetings to review T.C.'s progress during her time in foster care and to develop a plan to return her to mother's custody.  Mother never responded to the email invitations to these meetings and attended none of them.

Mother struggled to find housing, and requested assistance (which DFS provided) to pay for housing applications and a storage unit for her belongings while she secured housing.  DFS also provided bus tokens and gift cards in an effort to facilitate mother's job search efforts.  Eventually mother married and promised to provide a DFS with a copy of her marriage certificate and her new address, but never did so, nor did she provide the information necessary for DFS to run a background check on her new husband.  DFS workers also made numerous attempts to meet with mother to discuss the role that her new husband would play in T.C.'s life, but she refused most of those meetings and ultimately engaged in only minimal discussions.

In March 2016, DFS filed a petition to terminate mother's residual parental rights and change the foster plan goal to adoption.  The JDR court continued the case until December 2016, giving mother an additional nine months to comply with its prior orders, but following a hearing on December 2, 2016, the JDR court entered orders terminating mother's residual parental rights and approving the goal of adoption.[2]  Mother appealed to the circuit court, which held a trial *de novo* on April 17–18, 2017.  That court heard testimony from the DFS employees who had worked on mother's case, Phan, the psychologist who completed the parent-child evaluation, and from mother, her new husband, and her adult son.

---

[2] The same order terminated the residual parental rights of T.C.'s father, but he did not appeal that decision and is not a party to this case.

Witnesses for DFS testified at length about T.C.'s severe psychological problems, the progress she made in Phan's care, and the need for a highly structured, specialized care environment to help T.C. thrive. They also testified that mother had been systematically uncooperative, had refused to complete court-ordered psychological evaluations and treatment, and had not provided DFS with required information regarding her employment status, marital status, and living arrangements. Mother testified extensively about her distrust of the workers on her case, and her efforts to regain custody of T.C. Under cross-examination, however, mother acknowledged that she had little understanding of T.C.'s mental health challenges, or the treatment necessary to address T.C.'s needs. Mother also acknowledged that she was not actively employed, was living in housing that was inadequate for T.C., had failed to comply with court orders to provide her phone number and address to DFS, and had failed to keep DFS informed of changes in that information.

The trial court concluded that mother had failed to substantially remedy the conditions that led to T.C.'s placement in foster care, without good cause, and that DFS had made reasonable efforts to provide services in order to support the goal of reuniting mother and T.C. After articulating specific findings of fact, and findings regarding the credibility of witnesses in an oral ruling from the bench, the trial court entered orders terminating mother's residual parental rights and approving the foster care goal of adoption. This appeal followed.

## II. ANALYSIS

Mother claims on appeal that DFS's evidence did not meet the statutory "clear and convincing" standard for terminating parental rights, that DFS did not make reasonable efforts to help her, and that the trial court improperly admitted hearsay evidence. This Court disagrees. Clear and convincing evidence supported the trial court's conclusions, and even if this Court

were to assume the trial court erred by improperly admitting hearsay evidence, that error was harmless.

### A. Clear and Convincing Evidence

*Standard of Review*

Virginia's courts have consistently recognized that "[t]he termination of parental rights is a grave, drastic, and irreversible action." Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986). Each case is unique and requires careful examination of significant evidence, so this Court presumes that the trial court has "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). That presumption is rooted in a circuit court's "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 328, 387 S.E.2d at 795. A circuit court's decision "based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

*Failure to Remedy Conditions Leading to, or Requiring Continuation of, Placement*

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may do so if it finds, by clear and convincing evidence, that:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Clear and convincing evidence is a standard of proof that requires "a firm belief or conviction as to the allegations . . . . It is intermediate, being more than a mere preponderance, but not . . . beyond a reasonable doubt as in criminal cases. It does not mean clear and

- 7 -

unequivocal." Lowe, 231 Va. at 281 n.3, 343 S.E.2d at 72 n.3 (quoting Gifford v. Dennis, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985)).

Mother's argument focuses on the fact that the family's forced departure from the shelter in May 2015 and her lack of other housing at that time was the condition that immediately precipitated the JDR court's order placing T.C. into foster care. Because she had a place to live at the time of the circuit court trial in 2017, mother argued that she had remedied that condition and should have regained custody of her children. Her argument fails because it ignores not only her failure to remedy several other significant conditions which led to T.C.'s placement in foster care, but also her failure to cooperate with the reasonable efforts of DFS throughout the entire process, which led to T.C. remaining in foster care for almost two years.

In addition to mother's lack of suitable housing, the initial removal order also cited DFS's concerns about mother's ability to parent her children, her failure to deal with her own mental health problems, and her failure to address the medical and mental health needs of her children. Mother never completed her required psychological evaluation, nor did she complete the age-appropriate parenting class. She did not receive any treatment for her own mental health challenges, and never participated in T.C.'s follow-up treatment. By mother's own testimony, at the time of the trial she barely understood the severity of T.C.'s mental health diagnosis and the complicated course of treatment T.C. needed. She was not prepared to provide T.C. with the highly structured, carefully monitored home environment that she would need going forward. The trial court's conclusion that mother failed to substantially remedy the initial conditions that led to T.C.'s placement was not clearly wrong, because it was supported by ample evidence in the record.

In addition to the requirement that parents correct the conditions that led to the initial foster care placement, Code § 16.1-283(C)(2) also requires parents to remedy conditions which

*require continuation of* foster care placement. In this case, mother not only failed to remedy all of the initial conditions, but she contributed to T.C.'s continuation in foster care by her lack of cooperation with DFS. Mother was hostile toward DFS caseworkers and other professionals involved in the case. She placed unreasonable demands on DFS to adjust visits to meet her schedule. She was unresponsive to DFS's attempts to communicate with her, and eventually ceased communication with DFS entirely. She failed to provide an updated address or any information about her new husband, which prevented DFS from completing the evaluations necessary to place T.C. in mother's new home. Mother's failure to participate in court-ordered services and cooperate with DFS was the primary reason T.C. remained in foster care. All of these facts were established by multiple witnesses at the circuit court trial.

Code § 16.1-283(C)(2) also requires that parents substantially remedy the conditions which led to foster placement *within a reasonable time, not to exceed twelve months*. This time limit was established to "prevent an indeterminate state of foster care 'drift.'" L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). At the time of the trial, T.C. had been in foster care for twenty-three months, and the trial court found—with the support of ample evidence in the record—that many of the requirements of the foster care plan had still not been satisfied.

*DFS's Reasonable Efforts*

Mother alleged that DFS did not make reasonable efforts to help her regain custody of her child. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and

appropriate efforts given the facts before the court." Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 8 (1992). In this case, the evidence presented to the trial court showed extensive effort on the part of DFS to provide services to mother, despite her hostility and lack of cooperation. Although mother argues that her hostility toward DFS arose out of false accusations of sexual abuse, her uncooperative behavior towards DFS—notably her lack of cooperation in arranging visits—began long before the CPS investigation began and continued long after it was over.

During the initial period of foster care when mother was required to have supervised visits with T.C., DFS made frequent changes to the visit schedule to meet mother's requests and provided transportation to the visits. DFS did this even when mother skipped visits, demanded last-minute changes to the schedule, and refused to cooperate with transportation services. DFS attempted to resume visits after they were suspended, and even altered conditions of the visits to suit mother's desires, but she remained intransigent. She later refused to participate in planning meetings with the DFS treatment team and eventually cut off all contact with DFS. DFS "should not be required to force its services upon a parent who does not want them." Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243, 288 S.E.2d 410, 415 (1982). The trial court concluded that mother's conflict with DFS was unreasonable and that DFS made reasonable efforts to provide her with services supporting the goal of reunification.

The trial court determined that mother failed to comply with the requirements of Code § 16.1-283(C)(2) despite the reasonable efforts of DFS. This conclusion was supported by ample evidence in the record and was not plainly wrong. Accordingly, this Court will not disturb it on appeal.

## B. Hearsay Evidence

### Standard of Review

The "admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Cousins v. Commonwealth, 56 Va. App. 257, 272, 693 S.E.2d 283, 290 (2010) (quoting Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)).  By definition, a trial court "abuses its discretion when it makes an error of law." Coffman v. Commonwealth, 67 Va. App. 163, 166, 795 S.E.2d 178, 179 (2017) (quoting Commonwealth v. Greer, 63 Va. App. 561, 568, 760 S.E.2d 132, 135 (2014)).

### Merits

Mother argues that the trial court erred by admitting hearsay evidence about potential sexual abuse by mother against T.C., and she points to a single line of testimony regarding those allegations which may have been admitted erroneously.  Even assuming without deciding that there was error by the trial court on this point, we find that the error was harmless.  An appellate court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." Carter v. Commonwealth, 293 Va. 537, 544, 800 S.E.2d 498, 502 (2017) (quoting Shifflett v. Commonwealth, 289 Va. 10, 12, 766 S.E.2d 906, 908 (2015)).  An error may be found harmless when "overwhelming expert and other evidence support[s] the court's ultimate holding." Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1186, 409 S.E.2d 16, 21 (1991).

The trial court specifically found that it was not convinced that mother sexually abused T.C. and that the evidence was insufficient to reach any conclusion about who had sexually abused T.C.  The trial court's decision to terminate mother's parental rights was not based in any way on a finding about who, if anyone, abused T.C.  It was based instead on the overwhelming

- 11 -

evidence that mother failed to remedy the conditions which led to T.C.'s placement in foster care. "[E]rror which does not injuriously affect the interest of the party complaining is not reversible." Id. Mother's case was not harmed by any improper admission of hearsay, so this Court will not disturb the trial court's decision.

### III. CONCLUSION

Because the trial court's conclusions were supported by ample evidence and not plainly wrong, and because any error regarding the admission of hearsay evidence was harmless, this Court affirms the decision of the Fairfax County Circuit Court.

Affirmed.