COURT OF APPEALS OF VIRGINIA


Present: Judges Bumgardner, Frank and Humphreys
Argued at Richmond, Virginia


ANTOINE WILKERSON
                                             OPINION BY
v.   Record No. 2404-99-2          JUDGE ROBERT J. HUMPHREYS
                                         NOVEMBER 21, 2000
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                  James B. Wilkinson, Judge

        David M. Gammino; William T. Linka
        (Boatwright & Linka, on brief), for
        appellant.

        Amy L. Marshall, Assistant Attorney General
        (Mark L. Earley, Attorney General, on brief),
        for appellee.

     Antoine Wilkerson appeals his convictions after a jury trial

of first degree murder and robbery, claiming that the trial court

erred by 1) refusing to allow Wilkerson to introduce evidence of

inconsistent statements made by a Commonwealth witness; 2)

allowing the Commonwealth to introduce hearsay statements

pertaining to a conspiracy, before the Commonwealth had

independently established a conspiracy; 3) finding the evidence

sufficient to convict Wilkerson of robbery; and 4) finding the

evidence sufficient to convict Wilkerson of murder.  Wilkerson

further contends that the trial court erred in setting aside the

jury's conviction of Wilkerson for accessory after the fact to

first degree murder, and failing to set aside the conviction for

first degree murder.[1]  We disagree and, for the reasons that follow, affirm Wilkerson's convictions.

BACKGROUND

On the evening of December 8, 1997, between approximately 9:00 p.m. and 9:30 p.m., Carol Goring Smith was shot and killed as she returned home from work and began to walk up the stairway toward her second floor apartment at the Woods Edge Apartment Complex.  Another tenant of the apartment building, Ms. Cozzette Dushon Brown, who lived in the apartment located at the top of the stairway, was cooking in her kitchen when she heard scuffling noises outside her doorway, as if someone had fallen down the steps.  She also heard a "fade-away scream" that sounded like it came from a woman.  Brown went to her bedroom window and looked outside.  At that point, she saw a light-colored car back out of the parking lot to the apartment building.  She also saw Smith's car, a burgundy, four-door Chrysler Concord, back out of the parking lot, and the two cars drove away.

Ms. Brown's boyfriend was also in her apartment and witnessed the same events.  He immediately went to the doorway of the apartment and went outside to the breezeway to see what had happened.  He then came back and called the police.  While he was

_____

[1] The jury also convicted Wilkerson of accessory after the fact to robbery.  This verdict was, likewise, set aside by the trial court.  However, this conviction and action of the trial court in setting it aside have not been raised by Wilkerson as issues on this appeal.

-

on the phone with the police, Brown went to the doorway and looked outside. She saw Smith lying at the bottom of the stairway with blood "all down in the floor."

Detective Daryl L. Street ("Detective Street") of the Richmond Police Department was called to investigate and arrived on the scene at approximately 10:32 p.m. The scene was secure, and Smith's body had already been transported to MCV hospital. Detective Street observed that Patrick Smith, Smith's husband, was not present at the scene at that time. However, he returned to the scene at approximately 12:15-12:30 a.m.

On December 12, 1997, at approximately 11:00 p.m., Officer Steve Hines of the Richmond Police Department witnessed Smith's Chrysler "come through [his] radar at about 57 or 58 miles per hour in a 35 zone." Officer Hines chased the vehicle in his squad car until it hit some gravel and dirt and came to rest on the rear of a parked Cadillac. Although Officer Hines couldn't keep his eyes on the vehicle at all times due to the dust and gravel in the air, he observed Chi-Lief Brisbon get out of the passenger side of the vehicle as he approached the car. He saw no one else leave the car, and found no one else inside the car.

Since he had received a radio transmission stating that the Chrysler was linked to a violent crime, Hines apprehended Brisbon and placed him under arrest. Although there was no one else found in the car, Brisbon remained adamant that he had not been driving the car, but that another individual had been driving the car.

-

However, Brisbon was ultimately charged with, and pled guilty to, the unauthorized use of the vehicle.

While Brisbon was in custody for this matter, Detective Street interviewed him regarding his knowledge of the Chrysler and Smith's murder. During the first interview, which took place in December of 1997, Brisbon denied having any knowledge about the Chrysler and Smith, and continued to contend that another person had been driving the car; specifically, "Nard," a/k/a Kenardo Foster. Brisbon told Detective Street that Foster could tell him everything about the car. Upon investigating the car, a print belonging to Foster was lifted from the interior of the driver's side window.

During a second interview, which also took place in December of 1997, Brisbon gave the same statement and again contended that Foster could tell Detective Street everything about the car. However, in April of 1999, after Brisbon had been incarcerated for another murder, Brisbon spoke to Detective Street a third time. It was during this interview that Brisbon told Detective Street that he was involved with Smith's murder. He named Foster, Wilkerson and Patrick Smith as the other individuals involved.

On December 14, 1998, a grand jury indicted Wilkerson for capital murder in the course of a robbery, carjacking, use of a firearm in the commission of a murder, possession of a firearm as a convicted felon, capital murder for hire, and robbery. No

-

indictment charging Wilkerson with accessory after the fact to murder or robbery was returned by the grand jury.

The first witness to testify at trial was Mark DeLoatch, a tenant who lived in an apartment located at the opposite end of the building from Smith's apartment. DeLoatch testified that he had witnessed the murder. However, DeLoatch did not come forward to the police until Detective Street came to interview apartment tenants in December of 1997.

DeLoatch testified that during the interview, he informed Detective Street that on the evening of December 8, 1997, after he had come home from work, he was walking his dog on the lawn in front of the building. He noticed two young black males standing in front of the stairwell to Smith's apartment, talking for about 15 or 20 minutes. One of the males was shorter than the other one. At some point, the shorter male went to his car and then came back. DeLoatch identified Wilkerson as the "shorter male" at trial.

DeLoatch next saw Smith pull into the parking lot and park under a street lamp. He saw Smith get out of the car, pick up a bag of groceries and her other belongings, and walk toward her apartment. As she approached the stairway to her apartment, DeLoatch heard elevated voices. He then testified he heard Smith yell "something to the effect of no, no, no . . . please don't." Next, DeLoatch heard a gunshot and saw Smith's body collapse. DeLoatch observed that it was the taller male who held the gun and

-

shot Smith.  Then he watched the shorter male walk to a car, which was a "smaller vehicle . . . a Honda Civic or some form of hatchback or Escort."  The taller male followed the shorter male to the parking lot, and got into Smith's car.  The shorter male in the smaller car backed out and waited for the taller male to get into Smith's car.  At that point, both cars left the parking lot, with the light car being followed by Smith's car.

Detective Street testified that after his interviews with Brisbon and DeLoatch, as well as further investigation, he eventually determined that Wilkerson was the owner of a light blue, two-door, Honda Civic, matching the description of the car that witnesses saw in the parking lot on the night of Smith's murder.

Street testified that after he apprehended and Mirandized him, Wilkerson admitted knowing Foster.  Wilkerson told Detective Street that he had picked Foster up and they were together all day on the day of the murder.  He said they went to a Southside residence to see another individual called "Scar" and that while they were there, Scar gave Foster a black steel revolver.

Wilkerson first told Detective Street that Foster then asked him to take him over to the apartments where Smith lived to pick up his girlfriend's car.  Wilkerson said he took Foster there in his car, a light blue Honda Civic.  Once they arrived, he said he dropped Foster off and left immediately.

Later, he changed his story and told Street that after driving Foster to the apartment complex, he had stopped for a moment and gotten out of the car to check that his trunk light was off. Wilkerson's story changed a third time when he indicated that, after he dropped Foster off at Smith's apartment complex, he saw a burgundy car arrive. He saw a woman, that he didn't know, get out of the vehicle and go to the trunk to get some groceries. Wilkerson said it was then that he left the parking lot. When he got to the stoplight, he stated he saw the burgundy vehicle fly past him and wasn't sure whether it was Foster driving it or not. Wilkerson claimed he then went to his girlfriend's house. He said he didn't know a murder had taken place until he saw it the next day on the news and started piecing it together.

Wilkerson's story changed again later. This time, Wilkerson told Street that when he and Foster arrived, they waited in the Honda for awhile. They saw Smith pull up, get her groceries, and start walking toward the staircase. Foster said "look at that car, it's phatt" and said "let's go get the keys." Foster then stepped from the Honda as Smith was walking toward the breezeway, and walked in the same direction. Wilkerson stated that he asked Smith if he could help her with her groceries and she declined. As she walked towards the breezeway, Wilkerson stepped out of his car, went toward the back of the car and walked about 4-5 steps toward where Foster and Smith were. He claimed he did this to see if Foster was able to get the car, and because he wanted to find

-

out if he could leave or if he needed to wait for Foster. The next thing he knew he saw a flash and heard a scream, and saw the bag of groceries falling. Wilkerson told Street that Foster had shot Smith. Wilkerson stated he then left the complex and thought Foster was right behind him but he wasn't. He then met back up with Foster behind the residence of Vanessa Taylor, the mother of Wilkerson's child.

At first, he claimed that it was only him and Foster there and that Foster was driving Smith's Chrysler. This story changed also, and Wilkerson claimed that others were there. Specifically, Chi-Lief Brisbon, "Rob" and "Smoke."

In addition, Detective Street testified that he had observed Foster to be about 6' 1" to 6' 2" in height. He observed Wilkerson to be 5' 7" to 5' 8".

Counsel for Wilkerson asked several questions of Detective Street, based upon a transcript of an interview with Brisbon, in an attempt to introduce prior inconsistent statements to impeach the credibility of Brisbon. The trial court sustained the objection of the Commonwealth to these questions, holding that Wilkerson had failed to lay the proper foundation for introduction of the evidence. Specifically, the trial court stated to counsel "you have to warn the witness that you have evidence that is going to impeach him, the place, and time, and who is present, and did you make this statement. If he says no then you can say look at

-

the transcript and then its up to the jury to decide what is the truth, or neither."

Brisbon also testified during the trial.  Brisbon explained to the jury that he had come to Richmond from New Jersey about a week before Thanksgiving in 1997.  A few days after he arrived, he met Foster at the place he was staying.  Brisbon testified that Foster told him he had a "job" for him to do and said that he would explain it to him at a later time.

During this testimony, Wilkerson's counsel objected to the testimony concerning Brisbon's conversations with Foster on the grounds of hearsay, as well as on the basis that Foster was a "co-defendant" and not subject to cross-examination by Wilkerson. The trial court held that the statements were admissible "in a conspiracy" or in showing that "they're principals in planning any kind of crime" and overruled counsel's objection.

Brisbon went on to testify that he and Foster met again and it was then that Foster told Brisbon he wanted his help with a murder.  Foster explained to Brisbon that he needed him "to watch the lady, watch how she moves, you know, when she come home, when she leave, we going to shoot her, take her car, and make it look like it was a carjacking."  Foster also told Brisbon that he wanted him to shoot the lady.  Foster explained that there would be other people involved who would watch Brisbon's back and let him know if the police came.  Foster claimed that a "guy was going to pay [them] for doing it" and stated that they would be "getting

-

paid . . . from insurance." He also told Brisbon that he should take the car to New Jersey after the murder and get rid of it so that they could split the money.

Brisbon testified that the day before the murder, he was sitting in a car listening to music and smoking marijuana with Wilkerson. Wilkerson told him at that time that Foster would come to see Brisbon the next day. Brisbon stated that Wilkerson was "referring to the murder" when he made this statement. In addition, Brisbon stated that before the murder, he heard Wilkerson and Foster talking and saying "little things" about insurance and Patrick Smith.

On the night of the murder, however, Brisbon did not participate because he was in the custody of "Deputy Andrews." However, Brisbon saw Wilkerson and Foster, at about 11:00 p.m. to 11:30 p.m. that night. Brisbon testified that they were behind Taylor's house, sitting in the stolen Chrysler. Wilkerson was in the passenger seat of the car, Foster was in the driver seat and Patrick Smith was in the back seat. Wilkerson called Brisbon over to the car and said "what happened to you." It was then that Brisbon saw "money change from Patrick Smith's hand to Kenardo's hand."

Contrary to this, Natasha Brown, Wilkerson's girlfriend, testified that, although Wilkerson did not pick her up from work that evening as he usually did, he came home that night at 10:20 p.m. and did not leave again.

-

An employee of American General Life Insurance Company testified that a life insurance policy was taken out on behalf of Smith on May 1, 1994 for a face amount of $25,000. Patrick Smith signed a "claimant statement" requesting assignment of the proceeds the day after Smith was murdered. He received $20,837.07 (the face amount minus funeral and burial expenses) on January 6, 1998.

After all the evidence was received, the jury was instructed on the following offenses: (1) capital murder for hire (and the lesser-included offense of first degree murder); (2) use of a firearm in the commission of capital murder; (3) first degree murder while committing robbery; (4) use of a firearm in the commission of murder; (5) robbery; (6) accessory after the fact to murder; and (7) accessory after the fact to robbery. The instructions on accessory after the fact to murder and robbery were offered by Wilkerson although he was never charged with accessory after the fact of murder or robbery.

The jury found Wilkerson guilty of robbery, the lesser-included offense of first degree murder, accessory after the fact to murder and accessory after the fact to robbery. The jury acquitted Wilkerson of the firearm charges and also found him not guilty of committing capital murder while committing robbery.

After the jury was dismissed, the court considered final motions. Wilkerson made a motion to set aside the verdicts "as being contrary to the law and evidence." Essentially, he argued

-

that since the jury found Wilkerson guilty of robbery and murder, it was inconsistent for the jury to also find him guilty of accessory after the fact of these offenses.  As a result, he asked the trial court to set aside the convictions for robbery and murder and confirm only the lesser convictions for accessory after the fact.  The trial court agreed that the verdicts were inconsistent, but set aside the accessory after the fact convictions and upheld the convictions for murder and robbery.  As a result, Wilkerson was sentenced to 7 years for the robbery conviction and 60 years for the murder conviction.

## ANALYSIS

It is fundamental that on appeal "we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom."  Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997).

### A.  Inconsistent Statements

On appeal, Wilkerson first argues that the trial court erred in refusing to allow him to introduce evidence of inconsistent statements made by Brisbon.  As noted above, Wilkerson attempted to admit the alleged inconsistencies through the testimony of Detective Street.

We agree with the Commonwealth that when taking exception to the court's ruling in this regard, Wilkerson failed to make the statements or evidence he was attempting to introduce part of the record on appeal.  "[W]hen a party's evidence has been ruled

-

inadmissible, the party must proffer or avouch the evidence for the record in order to preserve the ruling for appeal; otherwise, the appellate court has no basis to decide whether the evidence was admissible." Zelenak v. Commonwealth, 25 Va. App. 295, 302, 487 S.E.2d 873, 876 (1997) (citation omitted).

## B. Hearsay Statements

Wilkerson next argues that the trial court erred in allowing the Commonwealth to introduce hearsay statements pertaining to a conspiracy, before the Commonwealth had independently established a conspiracy. Specifically, Wilkerson points to Brisbon's testimony regarding statements made to him by Foster concerning the robbery and murder.

"The general rule is that there must be evidence establishing a prima facie case of conspiracy before the declarations of a co-conspirator, made out of the defendant's presence, may be admitted into evidence." Floyd v. Commonwealth, 219 Va. 575, 581-82, 249 S.E.2d 171, 175 (1978). The purpose for this threshold requirement is to insure against "the risk that a co-conspirator may be making calculated statements to divert attention[,] by implicating others for his or another's wrongdoing . . . ." Jones v. Commonwealth, 11 Va. App. 75, 82, 396 S.E.2d 844, 848 (1990). In addition, in these situations, "the trier-of-fact typically will not have an opportunity to hear the declarant cross-examined, or view the declarant's demeanor or the evidence first hand." Id. Thus, "a

-

co-conspirator's declarations, like hearsay statements generally, are inadmissible absent some indicia of reliability." Id.

"A criminal conspiracy is merely an agreement between two or more persons to commit a crime . . . ." Simpson v. Commonwealth, 227 Va. 557, 567, 318 S.E.2d 386, 392 (1984). Prima facie evidence was defined in Babbit v. Miller, 192 Va. 372, 379, 64 S.E.2d 718, 722 (1951), as "evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted." Here, there was no prima facie evidence of the existence of an agreement between Foster, Brisbon and Wilkerson prior to Brisbon's testimony regarding his conversations with Foster.

> "Ideally, it is always more orderly to present sufficient evidence to establish the prima facie existence of the conspiracy and to identify the conspirators before presenting detailed evidence as to the substantive offenses and the acts and declarations of the conspirators . . . . As a practical matter, the proof is often 'sprawling' and at certain stages of the trial may appear to present a hodgepodge of acts and statements by various persons. In the final analysis, however, it is always necessary that the evidence be connected and enmeshed so as to present a logical sequence of evidence linking the defendant with the charges against him. The very nature of such cases requires that broad discretion be vested in the trial court with respect to the order of proof."

Floyd, 219 Va. at 582, 249 S.E.2d at 175 (citations omitted).

-

Thus, while Brisbon's testimony should not have been admitted pursuant to the conspiracy exception to the hearsay rule until a conspiracy was established, Brisbon's later testimony, which consisted of his firsthand knowledge of certain facts, did establish a criminal conspiracy between Foster, Brisbon, Wilkerson and Patrick Smith.

"The order of presentation of evidence . . . is usually a matter left to the discretion of the trial court and, absent an abuse of discretion, will not be disturbed." Cirios v. Commonwealth, 7 Va. App. 292, 300, 373 S.E.2d 164, 168 (1988) (citations omitted). "[S]tatements, otherwise inadmissible as hearsay, may be 'conditionally admitted subject to being "connected up" by subsequent independent proof of concert of action.'" . . . [Thus,] [w]hen the record shows facts from which the existence of a conspiracy could reasonably be inferred, the case will not be reversed because proof of the conspiracy came at the wrong time." Floyd, 219 Va. at 582, 249 S.E.2d at 175 (citations omitted). Accordingly, under these circumstances, we find, while the trial court erred in this regard, such error was harmless for the reasons noted. See Galbraith v. Commonwealth, 18 Va. App. 734, 742, 446 S.E.2d 633, 638 (1994); Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc).

C. <u>Sufficiency of the Evidence</u>

Wilkerson next argues that the trial court erred in finding the evidence sufficient to convict him of robbery and first-degree murder.

> Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom.  We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

<u>Higginbotham v. Commonwealth</u>, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  "If there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion."  <u>Commonwealth v. Presley</u>, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998).

Moreover, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented."  <u>Sandoval v. Commonwealth</u>, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citations omitted).  "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."

-

<u>Marable v. Commonwealth</u>, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citation omitted).

"[E]very principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished <u>in all respects</u> as if a principal in the first degree . . . ." <u>Charlton v. Commonwealth</u>, 32 Va. App. 47, 50, 526 S.E.2d 289, 290 (2000) (citing Code § 18.2-18) (emphasis in original). Given the evidence of Brisbon and the four inconsistent statements of Wilkerson which corroborate in some measure the testimony of Brisbon, viewing the evidence in the light we must, we find that the finder of fact could conclude beyond a reasonable doubt that Wilkerson was a principal in the second degree and therefore, was guilty of committing the charged offenses.

### D.  Accessory After the Fact

Finally, Wilkerson contends on appeal that the trial court erred in setting aside the jury's conviction of Wilkerson for accessory after the fact of first degree murder, and failing to set aside the conviction for first degree murder.[2]  We disagree.

---

[2] On appeal, Wilkerson also argues that the jury's conviction of Wilkerson for both murder and accessory after the fact of murder, violates his Fifth Amendment right against double jeopardy.  However, Wilkerson never raised this argument before the trial court and raises it for the first time on appeal.  Accordingly, we do not address this issue.  <u>See</u> <u>Swann v. Commonwealth</u>, 247 Va. 222, 441 S.E.2d 195 (1994).

We have previously held that inconsistent verdicts rendered by a jury do not constitute reversible error. See, e.g., Akers v. Commonwealth, 31 Va. App. 521, 529, 525 S.E.2d 13, 17 (2000); Tyler v. Commonwealth, 21 Va. App. 702, 707-09, 467 S.E.2d 294, 296-97 (1996); Wolfe v. Commonwealth, 6 Va. App. 640, 647-48, 371 S.E.2d 314, 318 (1988). The issue of inconsistent verdicts implicates no constitutional guarantee. See Wolfe, 6 Va. App. at 648, 371 S.E.2d at 318. Where a jury renders inconsistent verdicts, "a search of the trial record in an attempt to reconcile such inconsistency is neither appropriate nor required." Id. at 650, 371 S.E.2d at 319. "As long as the evidence supports both verdicts, they 'will be upheld, despite the apparent inconsistency.'" Akers, 31 Va. App. at 529, 525 S.E.2d at 17 (quoting Pugliese v. Commonwealth, 16 Va. App. 82, 96, 428 S.E.2d 16, 26 (1993)). Here, the evidence clearly cannot support both a verdict of guilty as a principal to murder and a verdict of guilty of accessory after the fact to the same murder.

While we have not previously considered the situation presented here, in doing so, we note that the Supreme Court of Virginia has recently held that "[w]hile convicting an accused of being an accessory after the fact requires proof that the accused provided assistance to a person with knowledge that the person was guilty of a completed felony, no such proof is required to convict an accused of murder. Thus, the crime of

-

being an accessory after the fact contains an element that the crime of murder, the charged offense in the present case, does not contain.  Therefore, the crime of being an accessory after the fact is not a lesser-included offense of the crime of murder."  Commonwealth v. Dalton, 259 Va. 249, 253-54, 524 S.E.2d 860, 862-63 (2000).  "Therefore, [the Court held] that, before a defendant can be tried and convicted of being an accessory after the fact, he must be charged with that offense. Unless such a charge is specifically made, neither the Commonwealth nor an accused is entitled to an accessory-after-the-fact instruction."  Id. at 254, 524 S.E.2d at 863.

Wilkerson was never charged with accessory after the fact. It was therefore error to instruct the jury that they could convict him of accessory after the fact as a lesser-included offense of murder.  Thus, we hold that the trial court was correct in rectifying this error by setting aside this conviction.

Affirmed.

-