COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued by videoconference


HECTOR ARMANDO GAMEZ AMAYA

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 1141-22-4            JUDGE JEAN HARRISON CLEMENTS
                                                   JANUARY 23, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Angela L. Horan, Judge

Daniel Zemel (Richard G. Collins; Collins & Hyman, P.L.C., on
brief), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Hector Armando Gamez Amaya of first-degree murder, abduction,

stabbing in the commission of a felony, conspiracy to commit murder, conspiracy to commit

abduction, two counts of participating in a criminal street gang, and concealing a dead body.  On

appeal, Gamez Amaya argues that the trial court should have instructed the jury regarding the

danger of convicting him based on the uncorroborated testimony of an accomplice.  Additionally, he

argues that the trial court abused its discretion by restricting his cross-examination of a witness and

admitting hearsay and certain credibility evidence.  We affirm the trial court's judgment.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In August 2017, Miguel Ruiz Carillo was an eighteen year old who attended school in Fairfax County, Virginia, with Jose Vincent-Sosa, Gamez Amaya, and Gamez Amaya's girlfriend, Daniela Bautista. Carillo, Vincent-Sosa, and Gamez Amaya were members of the criminal street gang Mara Salvatrucha-13 ("MS-13").[1] At trial, a gang expert testified that MS-13 is a transnational criminal organization based in El Salvador comprising hundreds of different "cliques" that function like "team[s]." The three main cliques in northern Virginia are Virginia Locos Salvatrucha, Los Directos, and Chilengeras. Vincent-Sosa was a member of the Virginia Locos Salvatrucha clique; Gamez Amaya and Carillo were members of the Los Directos clique.

According to the expert, MS-13 members must commit murders and other crimes at the direction of the gang's leadership to ascend in rank. The MS-13 leadership "green light[s]"— that is, orders—the killing of MS-13 members for gang rule violations, including "snitch[ing]" to police or testifying against gang members. When the MS-13 leadership issues a "green light," members of various cliques often "work[] together" to execute the order, and "[e]veryone [must] participate" to advance in rank.

_____

[1] The parties stipulated that MS-13 is a "criminal street gang" under Code § 18.2-46.2.

On August 3, 2017, Carillo, Bautista, Vincent-Sosa, and fellow MS-13 member Edwin Moreno were smoking marijuana together in the woods by a pond in Fairfax County, when Gamez Amaya arrived. Gamez Amaya became "upset" and repeatedly punched and kicked Carillo before announcing, "[L]ong life to the Mara Salvatrucha." He then led the group to an SUV that Gamez Amaya's friend, Rebecca Acosta-Teos, had parked nearby. When Bautista tried to leave, Gamez Amaya threatened to hurt her family if she refused to follow him. After Gamez Amaya forced Carillo onto the floor behind the driver's seat of the SUV, Acosta-Teos drove the group to a trailer park in Stafford County.

At the trailer park, Gamez Amaya forced Carillo, Moreno, Vincent-Sosa, and Bautista into a shed behind one of the trailers. Gamez Amaya then waited outside. A few minutes later, two unidentified men entered the shed. One man kept watch while the other bound Carillo's hands with bootlaces; the pair then blocked the shed's entrance to prevent his escape.

Meanwhile, Ishmael Hernandez Navarro and Tomas Pino Mejia, members of the Los Directos clique, received orders to kill Carillo from two high-ranking MS-13 leaders, "Angel" and "El Crimen." At Angel's and El Crimen's direction, Hernandez Navarro and Pino Mejia picked up three additional MS-13 members from the Chilengeras clique—Jose Carlos Escobar Salinas, Andreas Turcios Flores, and Marlon Huezo Rivero. The group then drove to the shed where Gamez Amaya was holding Carillo captive.

Hernandez Navarro waited outside in a van with Turcios Flores and Huezo Rivero while Pino Mejia and Escobar Salinas departed in Acosta-Teos's SUV to find a place to murder Carillo. About 90 minutes later, Gamez Amaya removed Carillo from the shed and forced him into the van. The two unidentified men exited the shed and placed a pickaxe and shovel in the van before returning to the shed to watch Bautista, Vincent-Sosa, and Moreno. Hernandez

Navarro, Turcios Flores, Huezo Rivero, and Gamez Amaya then transported Carillo in the van to an isolated road in Prince William County where Pino Mejia and Escobar Salinas were waiting.

Pino Mejia and Escobar Salinas led the group into nearby woods. At a clearing, Gamez Amaya and Escobar Salinas spoke on their cell phones. At trial, Hernandez Navarro testified that he and the others were "wait[ing] on the decision [to kill Carillo] from those who were speaking over the phone," although he already knew "what was supposed to happen" to Carillo from his earlier conversations with Angel and El Crimen. After Gamez Amaya and Escobar Salinas ended the calls, Huezo Rivero removed his belt and wrapped it around Carillo's neck while Gamez Amaya repeatedly stabbed Carillo with a knife. Gamez Amaya's cohorts then took turns stabbing Carillo with the knife until they knew he was dead. They continued stabbing Carillo afterward.

Acting on Angel's and El Crimen's orders, Gamez Amaya directed Hernandez Navarro to cut off Carillo's ear before they buried Carillo in a shallow grave. Gamez Amaya crushed Carillo's right knee with a pickaxe and unsuccessfully attempted to sever Carillo's legs and cut his body in half to force it into the grave.

Early the next morning, Gamez Amaya returned to the shed where Bautista, Vincent-Sosa, and Morena had remained. Bautista noticed that Gamez Amaya's clothes were "dirty" and he was carrying Carillo's shoes. Acosta-Teos drove Bautista, Vincent-Sosa, and Moreno back to their homes.

On August 4, 2017, Carillo's mother reported his disappearance to police. On August 22, 2017, detectives found Carillo's decomposing body in the shallow grave. The body was "folded in" on itself; Carillo's right "arm was under [his] body" and his "left arm was by [his] legs." Carillo's left ear was missing.

- 4 -

A medical examiner determined that Carillo died from at least 120 "[s]harp force injuries to [his] head, neck, torso, and extremities," including "9 stab wounds and 1 chop wound" to his abdomen and 30 "[s]harp and crushing force injuries to the extremities." There was also "extensive fracturing" in Carillo's "right tibia" and "right knee area," which was "caused by a heavy, crushing implement." The medical examiner further opined that a shovel or pickaxe likely caused some of the injuries.

Police investigators spoke to "two individuals" who reported they saw Gamez Amaya with Carillo by the pond shortly before his disappearance on August 3, 2017. Detectives searched Bautista's home. When Gamez Amaya learned of the search, he told Bautista that they had to "leave Virginia" and directed Acosta-Teos to drive them to a hotel in New Jersey. Gamez Amaya later allowed Acosta-Teos to drive Bautista back to her home to say "goodbye" to her mother. When Acosta-Teos and Bautista returned to Fairfax County, police arrested them and impounded Acosta-Teos's SUV. Police found a fingernail fragment on the floorboard behind the SUV's driver's seat; subsequent forensic examination determined that the fingernail fragment was Carillo's.

In September 2017, while Bautista, Vincent-Sosa, and Moreno were incarcerated pending trial in Fairfax County for Carillo's abduction, Prince William County detectives interviewed Gamez Amaya at a prison in Georgia where he was being held on unrelated charges. After the interview, Gamez Amaya called his sister and said that he would be extradited to Virginia for "five" charges in Fairfax County related to Carillo's disappearance—including gang participation and "kidnapping"—and that he would be charged with "homicide" in Prince William County.[2] While discussing his charges with his sister, Gamez Amaya said that Bautista,

---

[2] Gamez Amaya and his sister spoke to each other in Spanish. An interpreter transcribed the conversation in English. At trial, the Commonwealth introduced an audio recording of the phone call as well as the transcript.

Vincent-Sosa, and Moreno were "innocent" and they had "nothing to do with it." He claimed that they were "there because of ignorance." When Gamez Amaya's sister urged him to "defend [his] rights" because "[o]ne person" could not have committed all the offenses, Gamez Amaya replied, "I know what I've done. I know I alone did it."

Gamez Amaya's sister continued to challenge his account of the incident, but he insisted, "I did the sin." He claimed that two men had "tried to f—(expletive) me up and I'm not letting any a--hole (expletive) kill me." He further claimed that he "would have been the dead person" if he had not defended himself. Despite his sister's challenge that "they weren't going to kill you . . . . That's a lie," Gamez Amaya maintained, "I know how things went down. That is why I'm telling you."

Police later arrested Hernandez Navarro in Tennessee and extradited him to Virginia on charges of abduction and gang participation in Prince William County. Hernandez Navarro told police that he and other MS-13 members had murdered Carillo. Although he did not initially implicate Gamez Amaya, he later admitted that he, Gamez Amaya, Pino Mejia, Escobar Salinas, Turcios Flores, and Huezo Rivero murdered Carillo at Angel's and El Crimen's direction.

At trial, Bautista, Vincent-Sosa, and Hernandez Navarro testified regarding the offenses.[3] Bautista and Vincent-Sosa described Gamez Amaya's fight with Carillo at the pond in Fairfax County and Carillo's subsequent abduction to the shed in Stafford County. Hernandez Navarro recounted Carillo's abduction from the shed to the woods in Prince William County and Carillo's ensuing murder and burial.

Bautista, Vincent-Sosa, and Hernandez Navarro each acknowledged that they had provided inconsistent accounts to police and had been charged in Fairfax County and Prince

---

[3] Bautista, Vincent-Sosa, and Hernandez Navarro each testified in Spanish with an interpreter translating their testimony for the jury.

William County for Carillo's abduction. Bautista confirmed that she initially "lied" to police about her involvement but maintained she did so because Gamez Amaya had threatened to harm her and her family if she spoke to police. She also admitted that her charges were dismissed before Gamez Amaya's trial. Vincent-Sosa claimed that he provided inconsistent accounts of the incident to police because he had feared that MS-13 members would kill him if he "cooperated." He also testified that MS-13 leaders might "green light" him for testifying against Gamez Amaya. Vincent-Sosa and Hernandez Navarro both denied that the Prince William County prosecutor had promised them leniency in exchange for their testimony, although each hoped to "benefit" from testifying.

When defense counsel asked Vincent-Sosa whether the Fairfax County prosecutor had nolle prossed his charges before Gamez Amaya's trial, the Commonwealth objected on relevance grounds. Defense counsel argued that the question was probative of Vincent-Sosa's bias or motive to fabricate. The Commonwealth countered that the questioning was irrelevant unless defense counsel established that there was an agreement between the Prince William County and Fairfax County prosecutors regarding the disposition of Vincent-Sosa's charges. The trial court sustained the Commonwealth's objection.

Hernandez Navarro testified that before the incident, he spoke to Angel and another Los Directos leader about Carillo. When the Commonwealth attempted to elicit Angel's statements, Gamez Amaya objected on hearsay grounds. Outside the jury's presence, the Commonwealth proffered that Angel had ordered Hernandez Navarro to kill Carillo on August 3, 2017, and argued that the statement was admissible as a co-conspirator's statement made during and in furtherance of a conspiracy. Gamez Amaya countered that the Commonwealth had not established a prima facie case of conspiracy necessary to satisfy that hearsay exception. The Commonwealth ultimately withdrew the question and resumed questioning Hernandez Navarro

before the jury. Hernandez Navarro then testified that Angel and El Crimen, leaders of the Los Directos clique, called him and Pino Mejia and ordered them to drive Escobar Salinas, Turcios Flores, and Huezo Rivero to the shed in Stafford County where Gamez Amaya was holding Carillo captive.

Over defense counsel's renewed hearsay objection, Hernandez Navarro testified that Angel and El Crimen ordered him to kill Carillo. He explained, without objection, that after Gamez Amaya and his cohorts transported Carillo to the woods to murder him, they sought "permission to kill" Carillo because he had "raped" Escobar Salinas's relative and "stolen" items from another MS-13 member.

During redirect examination, Hernandez Navarro testified that "if someone" in MS-13 testifies in court, "[t]here will be an order to kill the person who spoke, as well as the family of that person." The Commonwealth then asked whether Hernandez Navarro had "that concern right now" and he replied in Spanish, the "Defendant has already put out a hit on my family." Before the interpreter could translate Hernandez Navarro's response for the jury, Gamez Amaya objected.

Outside the jury's presence, Gamez Amaya argued that the answer was inadmissible to rehabilitate Hernandez Navarro's credibility because nothing established how Hernandez Navarro knew that he had ordered Hernandez Navarro's family's murder. Additionally, Gamez Amaya asserted that although Hernandez Navarro's response might be probative of his credibility, the risk of unfair prejudice substantially outweighed any probative value. The trial court found that Hernandez Navarro's answer had limited probative value because it was "duplicative" of his unchallenged testimony establishing that MS-13 members risk being killed for testifying. Additionally, the court found that the answer had "a substantial prejudicial effect" that could not be overcome by a "curative instruction." Accordingly, the trial court held that

Hernandez Navarro's response "that the Defendant ha[d] put a hit on him" was inadmissible. Over Gamez Amaya's objection, the trial court nevertheless held that Hernandez Navarro could testify that he believed there were "current threats to his life and his family," provided he did not disclose the source of the threats. Hernandez Navarro then testified before the jury that he was "terrified" because he believed that there was "a threat on [his] life and on [his] family's li[ves] for [his] testimony."

Before closing arguments, Gamez Amaya asked the trial court to give Jury Instruction B:

> Ishmael Hernandez Navarro has testified that he was an accomplice in the commission of the crime charged in the indictment. While you may find your verdict upon his uncorroborated testimony, you should consider such testimony with great care and you are cautioned as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice. Nevertheless, if you are satisfied from the evidence of the guilt of the defendant beyond a reasonable doubt, the defendant may be convicted upon the uncorroborated evidence of an accomplice.

He asserted that the instruction was necessary because the Commonwealth relied solely on Hernandez Navarro's "uncorroborated testimony" to prove the conspiracy and murder charges. Gamez Amaya asserted that Vincent-Sosa and Bautista were both accomplices and, therefore, their testimony could not corroborate Hernandez Navarro's. Additionally, Gamez Amaya argued that none of the other evidence was corroborative because it did not implicate his involvement in the offenses.[4]

The trial court found that several "very important points of [Hernandez Navarro]'s testimony" were not "corroborated by non-accomplice testimony." Nonetheless, the trial court

---

[4] The Commonwealth later conceded that Bautista and Vincent-Sosa were accomplices. The trial court accepted that concession and concluded that Bautista and Vincent-Sosa were both accomplices. Accordingly, it did not consider their testimony in assessing whether Hernandez Navarro's testimony was sufficiently corroborated.

held that the non-accomplice evidence "tend[ed] to tie" Gamez Amaya to the charged offenses, so it refused Jury Instruction B. The jury ultimately convicted Gamez Amaya on all charges.

On appeal, Gamez Amaya argues that the trial court should have instructed the jury regarding the danger of convicting him based on the uncorroborated testimony of an accomplice. He also argues that the trial court abused its discretion by not allowing him to impeach Vincent-Sosa regarding the dismissal of his Fairfax charges. Finally, he argues the trial court abused its discretion by permitting Hernandez Navarro to testify regarding hearsay statements from Angel and El Crimen and that he feared death threats because of his testimony.

## ANALYSIS

I. The trial court did not abuse its discretion in rejecting proposed Jury Instruction B.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Holmes v. Commonwealth*, 76 Va. App. 34, 53 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022)). "Whether a proffered jury instruction accurately states the law, however, is reviewed *de novo*." *Id.* (citing *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)). "[I]n deciding whether a particular instruction is appropriate, we view the facts in the light most favorable to the proponent of the instruction." *Id.* (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)).

Although a jury may convict a defendant based solely on accomplice testimony, the "danger of collusion between accomplices and the temptation to exculpate themselves by fixing responsibility upon others is so strong that it is the duty of the court to warn the jury against the danger of convicting upon their *uncorroborated* testimony." *Id.* at 56 (emphasis added) (quoting

- 10 -

*Jones v. Commonwealth*, 111 Va. 862, 868 (1911)).  Conversely, "where accomplice testimony is corroborated, it is not error to refuse a cautionary instruction."  *Holloman v. Commonwealth*, 65 Va. App. 147, 175 (2015) (quoting *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976)).  "Whether the accomplice testimony was sufficiently corroborated" to justify refusing a cautionary instruction "is a question of law for the [trial] court," subject to de novo review on appeal.  *Holmes*, 76 Va. App. at 56 (quoting *Dillard*, 216 Va. at 824).

Corroborative evidence "need not be sufficient either to support a conviction or to establish all essential elements of an offense."  *Id.* (quoting *Dillard*, 216 Va. at 823).  *See also Dillard*, 216 Va. at 823-24 (holding that corroborative evidence need not establish the "ultimate fact" that the accused committed the charged offense).  Rather, a trial court may refuse a cautionary instruction where "the testimony of an accomplice is corroborated in material facts which tend to *connect* the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony."  *Id.* at 823 (emphasis added).[5]

Our Supreme Court has held that a defendant's admission that "he was present at the scene of the crime, aiding and abetting the commission of the [charged] offense" provides the required corroboration.  *Russell v. Commonwealth*, 216 Va. 833, 837 (1976).  Similarly, this Court held that a cautionary instruction was unnecessary where the defendant's "own statements" to police "linked him" to the charged offenses.  *Holloman*, 65 Va. App. at 175.  In *Holloman*, we emphasized that the defendant's account "matched" his accomplices' testimony describing his participation in the offenses, except that the defendant "did not admit that he ordered the robbery" that resulted in the victim's death.  *Id.*

---

[5] The required corroboration may not, however, come from "the testimony of another accomplice."  *Via v. Commonwealth*, 288 Va. 114, 115 (2014) (quoting *Jones*, 111 Va. at 868).

Gamez Amaya contends that the trial court erred by refusing proposed Jury Instruction B because Hernandez Navarro's testimony was "uncorroborated." He concedes that his statements to his sister on the recorded jail call "clearly alluded to a troubling situation" but emphasizes that they were ambiguous and conflicted with Hernandez Navarro's account. He argues that his statements did not implicate his involvement in the charged offenses, "especially the murder." We disagree.

Gamez Amaya's conversation with his sister centered on his pending and anticipated charges arising from Carillo's abduction and murder. Indeed, Gamez Amaya told his sister that he had "five" charges in Fairfax County and would be charged with "homicide" in Prince William County. During the conversation, he admitted that he "alone" committed "the sin"—although others were present. Later, Gamez Amaya claimed that he, not Carillo, "would have been the dead person" if he had not defended himself. Those statements corroborate material facts of Hernandez Navarro's testimony because, by Gamez Amaya's own account, he was the primary actor in the offenses against Carillo. *See Russell*, 216 Va. at 837 (finding sufficient corroboration where defendant admitted to police that "he was present at the scene of the crime, aiding and abetting the commission of the [charged] offense"); *Holloman*, 65 Va. App. at 175 (finding that the defendant's "own statements" to police "linked him" to the charged offenses). Thus, Gamez Amaya's statements to his sister corroborated Hernandez Navarro's testimony "in material facts" that "tend[ed] to connect" Gamez Amaya to the charged offenses, "sufficient to warrant the jury in crediting the truth" of Hernandez Navarro's testimony. *Dillard*, 216 Va. at 823. Accordingly, the trial court did not abuse its discretion in refusing the proffered cautionary instruction.

II. Any error in restricting Gamez Amaya's cross-examination of Vincent-Sosa concerning the disposition of his related Fairfax charges was harmless.

Assuming without deciding that the trial court improperly restricted Gamez Amaya's right to cross-examine Vincent-Sosa, we nevertheless affirm his convictions. The improper restriction of a criminal defendant's right to cross-examination is subject to constitutional harmless error review. *Cousins v. Commonwealth*, 56 Va. App. 257, 276 (2010) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). "The proper inquiry for constitutional harmless error is 'whether the [jury] *would have* returned the same verdict absent the error.'" *Commonwealth v. White*, 293 Va. 411, 421-22 (2017) (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)); *see Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that constitutional error is harmless if the appellate court is "able to declare a belief that it was harmless beyond a reasonable doubt").

Gamez Amaya asserts that he was entitled to cross-examine Vincent-Sosa on any issue probative of his credibility, including whether he had related charges in Fairfax County that were dismissed before Gamez Amaya's trial. He further asserts that such evidence was admissible to impeach Vincent-Sosa's credibility, regardless of whether the prosecutors in Prince William County and Fairfax County had discussed the disposition of Vincent-Sosa's charges.

Our harmless error analysis "turns not on the evidence excluded . . . but on the evidence in the record, viz., [the witness'] testimony, which was not fully subject to cross-examination." *Cousins*, 56 Va. App. at 276 (alterations in original) (quoting *Scott v. Commonwealth*, 25 Va. App. 36, 42 (1997)). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Maynard v. Commonwealth*, 11 Va. App. 437, 448 (1990) (en banc)). Important factors in the harmless error

analysis in this context include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted," and "the overall strength of the prosecution's case." *Id.* (quoting *Van Arsdall*, 475 U.S. at 684).

The Supreme Court held that the improper restriction of a defendant's right to cross-examine an accomplice concerning the disposition of his related charges in another jurisdiction was harmless where the accomplice's testimony was cumulative of other evidence and defense counsel questioned him on other matters that "tend[ed] to show any pressures acting upon [the accomplice] at the time he testified." *Hewitt v. Commonwealth*, 226 Va. 621, 623 (1984). Similarly, where a defendant's own statements "specifically linked [him] to the crime" and his counsel "fully argued" his accomplice's bias to the jury, any error in limiting his right to cross-examine the accomplice was harmless. *Shanklin v. Commonwealth*, 222 Va. 862, 865 (1981). *But see Woody v. Commonwealth*, 214 Va. 296, 300 (1973) (finding error in limiting cross-examination of accomplices regarding their uncharged offenses in another jurisdiction was not harmless where the *only* evidence "connecting [the defendant] with the crime" was their testimony).

Vincent-Sosa's testimony describing Carillo's abduction to the shed in Stafford County was not crucial to the Commonwealth's case because it was largely cumulative of Bautista's account. *Cousins*, 56 Va. App. at 276. Moreover, although the trial court prevented Gamez Amaya from asking Vincent-Sosa about his related Fairfax charges, Gamez Amaya thoroughly cross-examined him on other subjects that "tend[ed] to show any pressures acting upon" him during his testimony. *Hewitt*, 226 Va. at 623. For example, Vincent-Sosa acknowledged that he had a pending charge in Prince William County for abducting Carillo and that he hoped for

- 14 -

leniency in exchange for his testimony. Furthermore, Gamez Amaya emphasized those points during closing argument and urged the jury to reject Vincent-Sosa's account because he had a motive to fabricate his testimony. *Shanklin*, 222 Va. at 865.

In addition, other evidence overwhelmingly established Gamez Amaya's guilt. At trial, Bautista and Vincent-Sosa testified that after attacking Carillo by the pond in Fairfax County, Gamez Amaya forced him into an SUV and directed Acosta-Teos to drive them to the shed in Stafford County. There, two men bound Carillo's hands with bootlaces and held him captive until Hernandez Navarro arrived with additional MS-13 members. Gamez Amaya, Hernandez Navarro, and other MS-13 members then transported Carillo to the woods in Prince William County where they stabbed Carillo more than 100 times, cut off his ear, and buried him before fleeing. Moreover, as discussed above, Gamez Amaya's inculpatory statements to his sister linked him to Carillo's abduction and murder and permitted the jury to infer that he committed the charged offenses. *Id.*

Based on the evidence presented, we are confident that even if "the damaging potential of the cross-examination were fully realized," the jury nonetheless would have found Gamez Amaya guilty beyond a reasonable doubt. *Cousins*, 56 Va. App. at 276 (quoting *Maynard*, 11 Va. App. at 448). Accordingly, any error in the scope of Vincent-Sosa's cross-examination was harmless.

III. The trial court did not abuse its discretion by allowing Hernandez Navarro to testify that Angel and El Crimen ordered him to kill Carillo.

Determining "the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Pulley v. Commonwealth*, 74 Va. App. 104, 118 (2021) (quoting *Jones v. Commonwealth*, 71 Va. App. 597, 602 (2020)). "A reviewing court can conclude that 'an abuse of discretion has occurred' only in cases in which 'reasonable jurists could not differ' about the correct result." *Atkins v. Commonwealth*, 68 Va. App. 1, 7

- 15 -

(2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).  The proponent of evidence must establish its admissibility by a "preponderance of the evidence."  *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Witt v. Commonwealth*, 215 Va. 670, 674 (1975)).  A trial court resolves factual questions underlying admissibility.  *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001).  Such findings are binding on appeal "'unless "plainly wrong" or without evidence to support them.'"  *Campos*, 67 Va. App. at 702 (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)).

Gamez Amaya contends that the trial court erred by allowing Hernandez Navarro to testify that Angel and El Crimen ordered him to kill Carillo because those statements were inadmissible hearsay.  Gamez Amaya maintains that the Commonwealth failed to satisfy the hearsay exception specified in Virginia Rule of Evidence 2:803(0)(E), which permits a co-conspirator's statements made during and in furtherance of a conspiracy.

Hearsay evidence "'is inadmissible unless it falls within one of the recognized exceptions' to the rule against hearsay."  *Pulley*, 74 Va. App. at 118 (quoting *Jones*, 71 Va. App. at 604).  "One such exception provides that a statement made by the defendant's co-conspirator 'during the course and in furtherance of the conspiracy' is not excluded by the rule against hearsay."  *Id.* (quoting Va. R. Evid. 2:803(0)(E)).  Generally, "there must be evidence establishing a prima facie case of conspiracy before the declarations of a co-conspirator . . . may be admitted into evidence."  *Id.* at 119 (alteration in original) (quoting *Wilkerson v. Commonwealth*, 33 Va. App. 808, 820 (2000)).  Moreover, the prima facie case of conspiracy "must be established by evidence that is *independent of* the challenged co-conspirator's [hearsay] statements."  *Id.* (emphasis added) (citing *Rabeiro v. Commonwealth*, 10 Va. App. 61, 64 (1990)).

Nevertheless, the trial court's finding of prima facie evidence of a conspiracy is subject to deference on appeal. *Rabeiro*, 10 Va. App. at 64. Furthermore, "[t]he order of presentation of evidence" rests in the trial court's discretion and will not be disturbed "absent an abuse of discretion." *Pulley*, 74 Va. App. at 119 (alteration in original) (quoting *Wilkerson*, 33 Va. App. at 821). Thus, a trial court may "'conditionally admit[]' the co-conspirator statements 'subject to being "connected up" by subsequent independent proof of concert of action[,] . . . [and] the case will not be reversed because proof of the conspiracy came at the wrong time.'" *Id.* at 119-20 (alterations in original).

Prima facie evidence is "evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted." *Wilkerson*, 33 Va. App. at 820. "Conspiracy is defined as an agreement between two or more persons by some concerted action to commit an offense." *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 277 (2015) (quoting *Feigley v. Commonwealth*, 16 Va. App. 717, 722 (1993)). Proof of a "formal agreement among alleged conspirators" is unnecessary. *Pulley*, 74 Va. App. at 120 (quoting *Carr v. Commonwealth*, 69 Va. App. 106, 118 (2018)). Rather, if the evidence establishes that the defendant and others "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment," a fact finder may conclude "that they were engaged in a conspiracy to that object." *Id.*

The evidence here, independent of the challenged out-of-court statements, established a prima facie case of conspiracy among Gamez Amaya, Angel, El Crimen, and the other MS-13 members to abduct and murder Carillo. At trial, a gang expert testified that only certain high-ranking MS-13 leaders have the authority to order murders. Moreover, MS-13 members from various cliques coordinate to execute such orders, and "[e]veryone [must] participate" to advance in rank. Consistent with the gang expert's account, Hernandez Navarro testified,

without objection, that Angel and El Crimen, both high-ranking leaders of the Los Directos clique, directed him and Pino Mejia to drive three members of another clique—Escobar Salinas, Turcios Flores, and Huezo Rivero—to the shed in Stafford County where Gamez Amaya was holding Carillo captive.  After Gamez Amaya and his cohorts transported Carillo to the woods to murder him, he and Escobar Salinas spoke on their cell phones while Hernandez Navarro and the others "wait[ed] on the decision [to kill Carillo] from those who were speaking over the phone," even though Hernandez Navarro already knew "what was supposed to happen" to Carillo from his earlier conversations with Angel and El Crimen.  Indeed, Hernandez Navarro explained, without objection, that Gamez Amaya and his cohorts sought "permission to kill" Carillo because he had "raped" Escobar Salinas's relative and "stolen" items from another MS-13 member.  After Gamez Amaya and Escobar Salinas ended the calls, Gamez Amaya and his confederates stabbed Carillo to death, cut off his ear, and then buried him.

The above evidence permitted the trial court to infer that Angel and El Crimen conspired with Gamez Amaya and the other MS-13 members to abduct and murder Carillo.  *Cf. Pulley*, 74 Va. App. at 120-21 (finding prima facie evidence of conspiracy to distribute drugs where the defendant repeatedly called the alleged co-conspirator and arranged delivery of illicit substances to her house).  Accordingly, the trial court's admission of Hernandez Navarro's testimony that Angel and El Crimen ordered him to kill Carillo under Rule 2:803(0)(E) was not an abuse of discretion.

IV.  Any error in permitting Hernandez Navarro to testify that he feared death threats was harmless.

"An appellate court reviews a decision to admit or exclude evidence where no federal constitutional issue was raised under the standard for non-constitutional harmless error provided in Code § 8.01-678." *Haas v. Commonwealth*, 299 Va. 465, 467 (2021).  "Under that standard, the court 'determine[s] whether there has been a fair trial on the merits and whether substantial

- 18 -

justice has been reached [by] decid[ing] whether the alleged error substantially influenced the jury. If it did not, the error is harmless.'" *Id.* (alterations in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 259 (2001)). "In making the relevant determinations, the court 'consider[s] the potential effect of the excluded evidence in light of all the evidence that was presented to the jury.'" *Haas*, 299 Va. at 467 (alteration in original) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)).

"Among the circumstances in which harmless error occurs is when the improperly admitted evidence was 'merely cumulative of other, undisputed evidence.'" *Warnick v. Commonwealth*, 72 Va. App. 251, 272 (2020) (quoting *McLean v. Commonwealth*, 32 Va. App. 200, 211 (2000)). Such error is also harmless if the other evidence of guilt is "so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict." *Commonwealth v. Kilpatrick*, 301 Va. 214, 217 (2022).

Gamez Amaya argues that Hernandez Navarro's testimony that he feared death threats against himself and his family for testifying against Gamez Amaya was inadmissible to rehabilitate his credibility because the risk of unfair prejudice substantially outweighed its probative value. He asserts that although Hernandez Navarro's testimony was "probative" of his credibility, its probative value was limited because other evidence established that MS-13 members risk being murdered for testifying. Additionally, he argues that the evidence was unfairly prejudicial because Hernandez Navarro "did not identify the source" of the threat or how he knew it existed, thus, creating the risk that the jury might infer that Gamez Amaya "was behind the threat" while also depriving him of a fair opportunity "to combat the accusation."

Any error in admitting Hernandez Navarro's claimed fear for himself and his family for testifying against Gamez Amaya was harmless because it was cumulative of other substantially similar evidence. To begin, a gang expert testified that MS-13 leaders often order other

- 19 -

members killed for rule violations, including testifying against other MS-13 members. Hernandez Navarro also testified, without objection, that if an MS-13 member testifies in court, "[t]here will be an order to kill the person who spoke, as well as the family of that person." In addition, Vincent-Sosa testified, without objection, that MS-13 gang leaders might order him killed for testifying against Gamez Amaya. Similarly, Bautista testified, without objection, that she initially lied to police about her involvement in the offenses because Gamez Amaya had threatened to harm her and her family if she spoke to police. *See Warnick*, 72 Va. App. at 272 (holding erroneously admitted evidence harmless where "the same evidence came in through two other witnesses"). That testimony "significantly diminished the harmfulness" of Hernandez Navarro's testimony that he was "terrified" that there was a current threat against him and his family for testifying against Gamez Amaya. *See McLean*, 32 Va. App. at 212 (holding erroneously admitted evidence that the victim felt "intimidated" by the defendant's father was harmless where similar, undisputed evidence established that the victim feared the defendant).

In addition, as discussed above, the evidence overwhelmingly established Gamez Amaya's guilt, so "the error was insignificant by comparison" and "could not have affected the verdict." *Kilpatrick*, 301 Va. at 217. Thus, any error in admitting Hernandez Navarro's testimony that he feared death threats for testifying against Gamez Amaya was harmless because the trial court admitted other substantially similar evidence and the undisputed evidence overwhelmingly established his guilt.

CONCLUSION

We affirm the trial court's judgment because it did not err in refusing Gamez Amaya's proffered jury instruction. Moreover, any errors in admitting the challenged testimony were

harmless considering the overwhelming evidence of Gamez Amaya's guilt, including his own statements.

<em>Affirmed.</em>