COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia


ANTHONY PHILLIP SPENCER
                                              MEMORANDUM OPINION* BY
v.        Record No. 1271-24-2          CHIEF JUDGE MARLA GRAFF DECKER
                                                   JULY 22, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
M. Duncan Minton, Jr., Judge

Gregory R. Sheldon (BainSheldon, PLC, on brief), for appellant.

Susan Hallie Hovey-Murray, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Anthony Phillip Spencer appeals his jury-trial convictions for first-degree murder,

shooting at an occupied vehicle, and using a firearm in the commission of a felony in violation of

Code §§ 18.2-32, -53.1, and -154.  Spencer argues that the trial court abused its discretion by

admitting certain testimony about a firearm.  He also challenges the sufficiency of the evidence

to prove he was the killer based on his claim that the cooperating witness's testimony was

inherently incredible as a matter of law.  We hold the trial court did not err and affirm the

challenged convictions.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

Around 2:30 a.m. on September 3, 2022, Brandon Robertson went to an "after hours club" in Richmond co-owned by a friend named Greg. Also present were Robertson's brother Shuan and Spencer, whom Robertson and Shuan had met previously. Around 3:00 a.m., while Shuan and Robertson were outside the club, Brittany Horne, the mother of Robertson's infant child, arrived and spoke with Robertson. Robertson apologized for arguing with Horne earlier. He also asked her if she had a gun, and she replied that she did not. Spencer, who was standing nearby, said something "flirtatious" to Horne. Robertson warned Spencer to stop "disrespecting [him]," and the two men began fighting.[2] Greg was present during the fistfight, and Shuan and others eventually broke it up. After the fight, Robertson followed Horne's suggestion to leave because "a[n] argument [was] still going on."

At about 7:30 a.m. that morning, several hours after Robertson left the club, his friend Quinton Jones saw him in the parking lot of the apartment complex where both men lived. Robertson was in the driver's seat of his SUV. When Jones was unable to get Robertson's attention, he approached the SUV's open window. Jones touched Robertson and realized he was dead. He called Shuan and then 911.

Officers from the Chesterfield County Police Department responded to the emergency call. They found two cartridge casings on the ground near the SUV and a third in the parking lot. They

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This principle "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence . . . and . . . fair inferences'" from it that are "'favorable to the Commonwealth.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

[2] Robertson, Shuan, and Spencer had attended a pool party earlier in the evening and also went to the same nightclub before arriving at Greg's "after hours club." The record does not reflect what, if anything, transpired between Robertson and Spencer at those locations.

also noticed damage to the car's windshield and instrument panel. A handgun was found inside the car beside Robertson's right hip. A face mask that belonged to Jones was on the roof of the SUV. Fingerprints were lifted from the SUV.

During a search of Jones's car, police found Robertson's phone and backpack, as well as a BB gun. Samples were collected for a gunshot primer residue kit from Jones's hands.

The medical examiner concluded that Robertson died from a gunshot wound to his torso. Forensic analysis determined that the bullet removed from Robertson's chest and the three cartridge casings recovered from the scene were fired from the same gun. They did not, however, match the firearm recovered from Robertson's SUV.

The police investigated Spencer as a suspect in Robertson's murder. An officer went to Spencer's place of employment a few days after Robertson's body was discovered. Spencer's general manager identified a Chevrolet Tahoe in the parking lot as the vehicle that he believed was Spencer's. The next day, Spencer was arrested. He told the arresting officer that he had "injured his face." And he was "favoring his jaw area" at that time.

At trial, Keasia Sherriod, a friend of Robertson, testified she saw him and Spencer fighting outside the club. A few minutes after the fight ended, Robertson told her that he was going home.

When the prosecutor asked Sherriod if she saw "what Greg did after the fight," defense counsel objected, "anticipat[ing]" that the Commonwealth sought to elicit testimony that Sherriod "saw some unknown person hand Greg a gun." Defense counsel argued that the testimony was irrelevant because the prosecutor could not tie the firearm to Spencer. Counsel further asserted that the testimony was highly prejudicial because the Commonwealth would suggest to the jury that Greg "must have given [Spencer] a gun . . . , even though . . . no evidence . . . support[ed] that [claim]."

The prosecutor countered that Sherriod's testimony would "show that a gun was [provid]ed []to one of the people who was associated with the fight" and that it was "all about creating a picture of the scene." The prosecutor proffered that Greg was "closely associated with" Spencer and that Horne would testify the two men "refer[red] to each other as brothers."

The trial court overruled the objection to the admission of testimony about the gun.[3] Sherriod then testified that after the fight ended, she saw Greg go to the DJ booth, speak to the person inside, and receive a gun from that person. She watched Greg "walk[] out the door" and did not see him or Spencer again.

Horne testified that she arrived at the club around 3:00 a.m. on the morning of the shooting. The last text Horne received from Robertson was at 4:17 a.m. She stayed at the club until around 5:00 a.m. When she later reviewed video from her home security camera, she saw that Robertson's SUV arrived at her residence at 3:38 a.m., while she was still at the club, and left about five minutes later.

Horne testified that she knew Spencer through mutual friends. But she did not testify regarding any relationship between Spencer and Greg. Nor did she aver that Greg and Spencer were close or referred to themselves as brothers.

The Commonwealth introduced GPS data for Robertson's phone and for a phone number associated with Spencer. The final location entry for Spencer's phone was at 3:36 a.m. on the morning of Robertson's murder. At that time, both Spencer's and Robertson's phones were in a coverage area that included Horne's residence but not the club. When Robertson sent his last text at 4:17 a.m., his phone used a cell tower covering only his own apartment complex. Security footage

---

[3] The court noted that it would await the Commonwealth's efforts "further trying to connect [the gun] to . . . Spencer" and did not "see how [it would] get[] there." But the court stated that was "something to be argued" later in the case.

and witness testimony established that three gunshots were fired in Robertson's apartment complex parking lot between 4:20 and 4:30 a.m.

Additional evidence included a photograph from a motion-activated, roadside surveillance camera, taken near the entrance to Robertson's apartment complex. At 4:08 a.m., the camera captured the license plate number of Spencer's Tahoe. When the police searched the Tahoe, they found various pieces of mail addressed to Spencer and a cashier's deposit envelope bearing his nickname, Elmo. Also in the Tahoe was a "medical bracelet" from a local hospital bearing Spencer's name and the date of the murder, as well as a prescription in his name for pain medication, filled just hours after the murder.

Jones testified that he had known the Robertson family for more than two decades and renewed his acquaintance with them about a year before the murder. Jones thought of Robertson as "a little brother" and spoke to him almost daily. According to Jones, when the two men saw each other on the afternoon before the murder, Robertson asked him to ensure that Robertson's father received his things "if anything happened" to him. Jones did not understand this request, but Robertson did not elaborate.

Jones explained that when he discovered Robertson's body, he was wearing a ski mask due to the COVID-19 pandemic. Jones said he left the mask near Robertson's car when he discovered the body. He acknowledged that when the police first asked him whether he had any of Robertson's property, he said no "off [im]pulse" but that when they asked again, he admitted he "had the phone and the bag in [his] car." Jones also testified that when he called 911, he gave the dispatcher his name and phone number and did not try to hide his identity. He expressly denied killing Robertson.

Defense counsel cross-examined Jones extensively about the 911 call and played a recording of the call for the jury. He pointed out inconsistencies in Jones's statements about the

name he gave to the operator and what he said about the crime. Jones acknowledged that he sounded "[v]ery calm" on the call and posited that he was in shock at that time.

The fingerprints recovered from Robertson's SUV matched his and Jones's prints. Microscopic material taken from Jones revealed that he had three particles either "characteristic of" or "consistent with" gunshot primer residue on his hands. The analyst explained that the particles "could have been deposited by . . . handl[ing] a firearm . . . or . . . any other object that had primer residue on it."

Travis Bowden testified that he and Spencer were incarcerated together in late 2022 or early 2023.[4] Bowden described an occasion when Spencer addressed why he was in jail. A third inmate showed the group a YouTube video about that inmate's crime. Bowden testified that Spencer said, "I got one, too," and then played a video of a memorial service. The third inmate said that he had "been having problem[s] sleeping" because he felt remorse for his crime. Spencer replied that he "sle[pt] good at night," adding that this was because "the guy broke his jaw." Spencer identified his victim as "Beezy," which was Robertson's nickname.[5]

A letter written by Bowden to "[his] prosecutor" offered help in exchange for possible leniency regarding his own crimes. According to the letter, Spencer talked to Bowden about the murder and "admit[ted] . . . why [h]e did it."

Spencer's counsel cross-examined Bowden at length. Bowden acknowledged that he had numerous prior felony convictions and was serving an active prison sentence. He asserted that he

---

[4] Bowden testified the men were housed together for "about three months." A correctional officer from the jail testified that Spencer and Bowden were housed together for about nineteen days.

[5] Bowden testified that, on a subsequent occasion, when Spencer returned from an "attorney visit," he reported that "they had a door cam," he did not "know how they didn't hear shots that night," and "the body was found in the morning." Another time, Spencer "got off the phone" and said that "his girl was . . . upset and scared." According to Bowden, Spencer said that he "told her to just keep her mouth close[d]."

had testified against a co-defendant, and defense counsel contradicted him with proof that the co-defendant had pleaded guilty instead of going to trial. Bowden admitted that he contacted the prosecutor and offered to testify against Spencer because he hoped to have his sentence reduced in exchange for his testimony, but he also said that he wanted "to do the right thing."

Defense counsel questioned Bowden extensively about his statements to law enforcement regarding what Spencer said about Robertson's murder. Bowden denied researching the case and indicated that he got all the information about which he testified from Spencer. He also stated that he had not been promised anything for his testimony.

At the close of the Commonwealth's case, Spencer made a motion to strike, asserting that no evidence proved he was the person who shot and killed Robertson. He also contended that Bowden's testimony was incredible as a matter of law. The trial court denied the motion. Spencer did not present evidence and renewed his motion to strike. The trial court took the motion under advisement. The next day, it submitted the case to the jury, which convicted Spencer on all counts.

Spencer subsequently renewed his motion to strike. The court concluded that although Bowden's testimony contained "contradictions and inconsistencies," the testimony was not "inherently incredible as a matter of law." It denied the renewed motion to strike and sentenced Spencer to a total of seventy-three years of incarceration with twenty-five years suspended.

ANALYSIS

I. Evidentiary Objection

Spencer challenges the admissibility of certain evidence related to a gun. "When reviewing a trial court's decision to admit or exclude evidence, [appellate courts] apply an abuse of discretion standard. In this context, 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Bista v. Commonwealth*, ___ Va. ___, ___ (Nov. 14, 2024) (citation omitted) (quoting *Kenner v.*

*Commonwealth*, 299 Va. 414, 423 (2021)). The "bell-shaped curve of reasonability" underpinning appellate review for an abuse of discretion "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). This Court will hold a trial court abused its discretion only when "reasonable jurists could not differ" as to the correct result. *See Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017)). Of course, at trial, "[t]he proponent of the evidence bears the burden of establishing [by a preponderance] . . . the facts necessary to support its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019) (second alteration in original) (quoting *Perry v. Commonwealth*, 61 Va. App. 502, 509 (2013)). Once that threshold is met, "any gaps in the evidence" go to the jury's "assessment of its weight rather than its admissibility." *Id.* at 122-23.

"Generally, '[a]ll relevant evidence is admissible' unless provided otherwise by other rules." *Jones v. Commonwealth*, 71 Va. App. 70, 88 (2019) (alteration in original) (quoting Va. R. Evid. 2:402). Threshold relevance is a low bar. *See* Va. R. Evid. 2:401. Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." *Id.* "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original) (quoting *Va. Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999)). And "[e]vidence is relevant if it has *any* logical tendency, *however slight*, to establish a [material point] in the case." *Cousins v. Commonwealth*, 56 Va. App. 257, 271 (2010) (emphases added) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)).

Sherriod testified that, right after the fight between Spencer and Robertson, Greg obtained a firearm from the person in the DJ booth. Spencer claims that this testimony was irrelevant because the Commonwealth adduced no evidence to connect that firearm to Spencer or the charged offenses. But the fact that the Commonwealth did not present any evidence that this firearm was the murder weapon does not render it irrelevant under the broad standard established by caselaw. Rather, as the Commonwealth contends, Sherriod's testimony about the firearm provided the jury with additional context regarding the violent fight between Spencer and Robertson.

The fight—which occurred shortly before the murder—was critical to the Commonwealth's case because it established Spencer's motive to murder Robertson. Shuan testified that the "scene . . . after the fight" was "chaotic." Horne reported that Robertson asked her for a gun before the fight but she did not have one. She further stated that after the fight, she repeatedly told Robertson to leave because "they . . . hadn't got [things] straight" and "a[n] argument [was] still going on." After Robertson left, he armed himself, as reflected by the gun found in his SUV beside his right hip. The fact that Greg—who co-owned the club and saw the fight—also procured a firearm shortly after the fray provided the jury with additional information to consider in assessing the seriousness of the fight and the possible connection between the fight and the murder in the context of all of the circumstances. Accordingly, the trial court did not abuse its discretion by determining that the testimony was relevant.

A trial court nevertheless may exclude relevant evidence if its "probative value . . . is substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a). In this context, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Walker v. Commonwealth*, 302 Va. 304, 320-21 (2023) (quoting *Lee v. Spoden*, 290 Va. 235, 251-52 (2015)). Of course, all evidence

relevant to prove guilt is prejudicial to an accused to some degree, and "Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences." *Mayfield v. Commonwealth*, 59 Va. App. 839, 849 (2012) (alteration in original) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 758, *adopted on reh'g en banc*, 45 Va. App. 811 (2005)). Necessarily, "[t]he responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." *Walker*, 302 Va. at 320 (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008) (alteration in original)).

In light of "the deference we accord to trial judges in balancing probative value with undue prejudice," we conclude that the trial court did not abuse its discretion by admitting Sherriod's testimony about the firearm she saw a short time after the fight. *See id.* at 321. Spencer contends that, "[g]iven the lack of foundation" tying the firearm to him, this testimony "could lead only to an illegitimate inference"—namely, that Greg gave the firearm to Spencer, who used it to shoot Robertson.[6] As already noted, however, the jury could consider the testimony either standing alone, to assess the contentious nature of the fight at the club, or in combination with its possible relationship to Robertson's murder a short time later.

We hold that the trial court did not abuse its discretion by concluding that the probative value of the evidence was not substantially outweighed by a risk of unfair prejudice, a finding necessary to require exclusion under Virginia Rule of Evidence 2:403(a). The court therefore did not err by admitting the testimony.[7]

---

[6] On brief, Spencer suggests only the likelihood that admitting the evidence "could lead . . . to an illegitimate inference" because it was irrelevant. He does not suggest that it was likely to "inflame irrational emotions." *See Mayfield*, 59 Va. App. at 849 (quoting *Thomas*, 44 Va. App. at 758).

[7] Because we hold the admission of the evidence was not error, we do not reach the closer question, necessary for harmless error analysis, concerning whether the transcript from the final

II. Sufficiency of the Evidence

Spencer contends the evidence was insufficient to support his conviction as a matter of law.  "[W]hen reviewing whether the evidence was sufficient to convict a defendant of a criminal offense, an appellate court has a 'limited' role . . . ."  *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024)).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).  The only relevant question on appeal "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact," in this case the jury, "could have found the essential elements of the crime beyond a reasonable doubt."  *Barney*, 302 Va. at 97 (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact . . . .'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Spencer contends that the trial court erred by rejecting his argument that Bowden's testimony was incredible as a matter of law.  He concludes that "[i]n the absence of Bowden's testimony, . . . [he] could not have been convicted."

"[D]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], wh[o] has the unique opportunity to observe the demeanor of the witnesses as they testify."  *Maust v. Commonwealth*, 77 Va. App. 687, 702 (2023) (en banc) (second and third alterations in

---

day of trial, which was filed late, was indispensable to that issue.  *See McDaniel v. Commonwealth*, 73 Va. App. 299, 317 & n.6 (2021); *cf. McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (assuming without deciding that an issue was properly before the Court because addressing it on the merits provided the best and narrowest ground for resolution).

original) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015)). "[T]his Court must accept 'the [jury's] determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). This is an extremely high bar. "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

The record, viewed under the proper standard, does not support Spencer's assertion that Bowden's testimony was inherently incredible as a matter of law. He argues that Bowden's testimony was replete with inconsistencies and contradictions. He further claims that Bowden's many felony convictions and patent self-interest further impugned his credibility. These were proper subjects for cross-examination and closing argument but do not render the testimony inherently incredible as a matter of law. *See Kelley v. Commonwealth*, 69 Va. App. 617, 626-27 (2019). Here, defense counsel cross-examined Bowden at length about Spencer's statements and Bowden's motivations for testifying. Bowden's initiation of contact with the prosecution, his delayed recollection about whether Spencer admitted using a gun, and various inconsistencies in Bowden's testimony about what Spencer reported did not render his testimony inherently incredible or otherwise "unworthy of belief." *See Juniper*, 271 Va. at 415. Rather, "[t]h[ese] circumstance[s were] appropriately weighed as part of the entire issue of witness credibility, which is left to the [fact finder] to determine." *Id.* Consequently, Bowden's testimony was not inherently incredible, and the jury was entitled to give it as little or as much weight as it deemed appropriate.

The evidence, including Bowden's testimony, was sufficient to prove that Spencer was the person who shot Robertson. "[T]he Commonwealth bears the burden of proving the identity of

the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *See Lambert v. Commonwealth*, 70 Va. App. 54, 65 (2019), *aff'd*, 298 Va. 510 (2020); *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "[C]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence[ if] it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). But "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact [the resolution of which] is binding on appeal unless plainly wrong." *Fary v. Commonwealth*, 77 Va. App. 331, 344 (2023) (en banc) (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022)), *aff'd per curiam*, 303 Va. 1 (2024).

Importantly, appellate courts "eschew the divide-and-conquer approach, which examines each incriminating fact in isolation." *Barney*, 302 Va. at 97. Instead, the reviewing court considers the evidence "as a whole." *Id.* (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). "[A]ppellate review recognizes that, although a 'single piece of evidence may [not] be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion.'" *Garrick*, 303 Va. at 184 (second and third alterations in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

Here, testimony and other evidence from Robertson's neighbors supported a finding that he was shot to death in his SUV in his apartment complex parking lot between 4:20 and 4:30 a.m. on September 3, 2023. It is undisputed that Robertson and Spencer engaged in a serious fistfight at a club less than two hours earlier. Although Shuan broke up the fight, the scene remained chaotic, and Robertson left a short time later at Horne's urging. Spencer

- 13 -

obtained medical treatment, including a prescription for pain medication, several hours after the fight and reported having an injured jaw at the time of his arrest. These facts permitted the jury to infer that the fight with Robertson was significant and Spencer sustained the jaw injury during the fight.

In short, based on the evidence, the jury could find that Spencer had a clear motive to harm Robertson. *See generally House v. Bell*, 547 U.S. 518, 540 (2006) ("When identity is in question, motive is key."). Although motive is not an element of the offenses, it is "relevant and probative" of Spencer's identity as the shooter. *Tibbs v. Commonwealth*, 31 Va. App. 687, 704 (2000) (quoting *Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985)); *cf. Mayfield*, 59 Va. App. at 849 (recognizing motive as persuasive in proving intent). And the jury could consider the motive evidence together with the circumstantial evidence placing Spencer in the area where Robertson's body was found. The roadside surveillance camera placed Spencer's Chevrolet Tahoe near the entrance to Robertson's apartment complex mere minutes before the murder. Spencer contends that the Commonwealth did not establish either that he was driving the vehicle when the photo was taken or that the vehicle entered the apartment complex. But the testimony of Spencer's employer and the documents found in the SUV (including mail addressed to him and papers reflecting his treatment in the hospital emergency room only a few hours after Robertson's murder) supported the inference that Spencer was driving the vehicle at the time of the murder. And Spencer's presence *near* the entrance to the apartment complex minutes before the shooting was probative of his identity as the shooter even without direct evidence placing him in the parking lot.

The Commonwealth also adduced evidence that Spencer's cell phone last connected with a cell tower at 3:36 a.m. on the night of the murder. At that same time, Robertson was outside Horne's apartment, and Spencer's phone was in the same coverage area as Robertson's phone, a

- 14 -

distance from the club where the fight took place earlier. The jury could conclude that this evidence supported the Commonwealth's theory of the case: that after the fight at the club, Spencer ultimately pursued Robertson to his residence and shot him inside his SUV.

Finally, the jury could find that Bowden's testimony about Spencer's admissions tied together the circumstantial evidence, including the evidence of Spencer's motive for murdering Robertson. Bowden, who was housed in the jail with Spencer, testified that Spencer made several statements indicating that he killed Robertson. A jury that credited Bowden's testimony—as it was entitled to do—could conclude that Spencer's inculpatory statements, coupled with his motive and the other circumstantial evidence, eliminated every reasonable hypothesis other than that Spencer was the shooter.[8] *See Sarka*, 73 Va. App. at 67.

We hold, viewing all the evidence in the light most favorable to the Commonwealth, that a rational jury could find that Spencer murdered Robertson.[9] Therefore, the trial court did not err by denying Spencer's motion to strike and holding the evidence was sufficient to support his convictions as a matter of law.

---

[8] Spencer suggests "a reasonable hypothesis of [his] innocence [i]s that . . . Jones was the person who shot and killed" Robertson. But Jones testified at trial and expressly denied that he was the shooter. The jury, acting as the factfinder, clearly determined that Jones's testimony denying any involvement was credible. *See Juniper*, 271 Va. at 415. And in accepting Jones's denial, the jury rejected Spencer's hypothesis of innocence. *See Wilkerson*, ___ Va. at ___ (observing that "the factfinder is the one who 'determines . . . whether to reject as unreasonable the hypothesis of innocence advanced by a defendant'" (quoting *Moseley*, 293 Va. at 464)); *see also Garrick*, 303 Va. at 182 ("An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not [find or draw]. This remains so even when the factfinder could have found those facts or drawn those inferences but, exercising its factfinding role, elected not to do so.").

[9] Based on this conclusion, we do not consider Spencer's argument that the remaining evidence, excluding Bowden's testimony, was insufficient to support his conviction. *See, e.g.*, *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 16, 2025) (holding that the best and narrowest ground for decision was the defendant's failure to prove one of four elements necessary to her claim and declining to address the other three elements on that basis).

CONCLUSION

We hold that the trial did not abuse its discretion by admitting testimony that an owner of the after-hours club had obtained a firearm in the period of a few hours between when Spencer and Robertson fought and when Robertson was shot to death. We also conclude that Bowden's testimony was not inherently incredible and the evidence as a whole was sufficient to support Spencer's convictions. For these reasons, we affirm the trial court's judgment.

*Affirmed.*